Taylor v. Wands.

WILLIAM T. TAYLOR and HARRY C. TAYLOR, appellants,

*v.*

FREDERICK J. WANDS, respondent.

1. A married woman may embark her own money and capital in any separate business or trade, may employ agents to carry on such business or trade and may avail herself of their skill and ability to make it successful.

2. When a married woman employs her insolvent husband as such an agent, the transaction will be carefully scrutinized, but if there is evidence that the business was established by her with her own money and no evidence that money or capital of the husband was embarked therein, or that his employment was a device to shield from his creditors property or money which ought to be devoted to the payment of his debts, then the profits and earnings of the business will belong to the married woman, though partly due to the business ability, experience and energy of her husband.

3. A married woman united with her two sons and her insolvent husband in the formation of a trading corporation and she and her sons took all the stock issued except one share, which was allotted to the husband without payment. The money paid in by her on her shares was her own. The husband was employed as president and manager of the corporation upon a salary not shown to be unreasonable. There was no sufficient proof that the arrangement was devised to cover from his creditors any property of his —*Held*, that the undivided earnings of the corporation, represented by her shares of stock, belong to her, though due in part to the skillful management of the business of the corporation by her husband.

Taylor *v.* Wands.

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is reported in *Wands* v. *Taylor, 34 Atl. Rep. 142.*

*Mr. Garret D. W. Vroom* and *Mr. Chauncy H. Beasley,* for the appellants.

*Mr. Peter Backes,* for the respondent.

The opinion of the court was delivered by

MAGIE, J.

The decree appealed from was made upon a bill filed by Frederick J. Wands, assignee, the respondent, against John Taylor, Harry C. Taylor, William T. Taylor, the Taylor Provision Company and others, the general purpose of which was to subject certain real and personal property, charged to be property of John Taylor, to a judgment entered by confession in the supreme court on April 7th, 1893, in favor of respondent and against John Taylor and William C. Brandt.

The decree gave the relief prayed for by respondent in various particulars. Harry C. and William T. Taylor have appealed from the whole of the decree, but since they are only affected by it in two particulars, our attention may be confined to them. It adjudged that the surplus (by which was evidently meant the undivided earnings) of the Taylor Provision Company, so far as such surplus represented forty-eight shares of its capital stock standing in the name of appellants, was subject to the lien of respondent's judgment, and directed a reference to ascertain what surplus the company has. It further adjudged that the lands described in the bill, which formerly belonged to John Taylor, were also subject to respondent's judgment, and decreed that conveyances thereof made by John Taylor, under which, by divers mesne conveyances, the title to one of the tracts had come to Harry C. Taylor and the title to the remaining tracts had come to the Taylor Provision Company, should be annulled and set aside.

With respect to the part of the decree which dealt with the undivided earnings of the Taylor Provision Company, the issue

made by the pleadings, briefly stated, was this: The bill charged that John Taylor, Catharine M., his wife, and Harry C. and William T. Taylor, who are sons of John and Catharine M. Taylor, organized that company, but that all the stock was the property of John Taylor, and the shares held by Harry C. and William T. Taylor were held for John Taylor and to protect them from respondent's judgment. The prayer was that appellants should be decreed to transfer all their stock in said company to a receiver to be appointed in the cause. Each appellant answered and denied the charge of the bill in this respect.

With respect to the part of the decree which dealt with the lands, the bill charged that John Taylor, with intent to defraud respondent and to protect said lands from respondent's judgment, had conveyed them to Edward H. Murphy, who afterwards conveyed them to the Mechanics' National Bank of Trenton, which afterwards conveyed them to Benjamin Van Cleve, who conveyed one tract to Harry C. Taylor and the remaining tracts to the Taylor Provision Company. The prayer on this subject was that the deeds should be set aside. Appellants' answers contained a specific denial of this charge.

The Taylor Provision Company did not at first file an answer, and a decree *pro confesso* was entered against it. But that decree has since been opened and an answer has been filed by the company, containing like specific denials.

It is scarcely necessary to observe that respondent's decree, upon these issues, can only be supported by sufficient evidence of the fraudulent character of the impeached transactions. Evidence which merely excites suspicion that fraud may have existed will not be sufficient. It must reasonably justify an inference of the actual existence of fraud.

As to the organization and stock of the Taylor Provision Company, the only witnesses called by respondent were John Taylor and the appellants. Upon their evidence the following facts were established:

In 1860, upon the marriage of John Taylor with Catharine M. Taylor, a policy of insurance upon his life for $5,000 was,

in some mode not· disclosed by the evidence, made payable to her. It does not appear who kept the policy alive by the payment of the premiums. It does not appear that John Taylor paid any premium upon that policy after incurring the debt whereon respondent's judgment was founded. In August, 1888, the firm of John Taylor & Company, composed of John Taylor and William C. Brandt, failed for a large amount. At that time Mrs. Taylor had held the policy of insurance in question for twenty-eight years, and there is nothing in the case to justify a doubt as to her absolute right to it, free from any claim by John Taylor's creditors. About the 1st of September, 1889, she surrendered the policy to the company which had issued it in consideration of a present payment to her of $2,400. On the 4th of September, 1889, the Taylor Provision Company became incorporated by the filing of a proper certificate declaring that its capital stock was to be $250,000, divided into two hundred and fifty shares of $100 each, but that the company would commence business upon payment of $5,000. It also appears that fifty shares of the capital stock were subscribed, of which Mrs. Taylor took forty-seven shares, each of the appellants took one share and John Taylor took one share.

About the same time appellants obtained some money by the surrender of a policy of life insurance upon the life of their father, payable to them. There is no evidence that the money thus acquired was not their own, free from any claim of their father's creditors. If the fact were otherwise, it has not been made to appear.

All the money procured by the surrender of the life insurance policies was paid into the newly-formed company. Mrs. Taylor paid in $2,400 and gave her due-bill to the company for the difference between that sum and the par value of her forty-seven shares. John Taylor paid nothing for his share.

It is unnecessary to discuss whether this transaction was conducted in accord with the provisions of the Corporation acts, for it could only be questioned in that respect by other stockholders or by creditors of the company.

Shortly after the formation of the company Mrs. Taylor

became sick and continued so until her death, in April, 1890. On January 31st, 1890, when her death was expected by herself and her family, she transferred twenty-three of her shares of its stock to one of the appellants and twenty-three more to the other appellant, retaining one share in her own name. Her certificate was surrendered and new certificates issued to appellants. No consideration was paid for the stock; the transaction was a gift from the mother to her sons.

The vice-chancellor criticised this transaction as having been suggested by John Taylor. I am unable to perceive the justice of such criticism. John Taylor was hopelessly bankrupt. If his wife owned these shares of stock, or an interest in them, and died intestate, his creditors could require them to be applied to the satisfaction of their debts. But his duty to his creditors did not extend beyond such property as he had acquired. It did not require him to refrain from advising her as to the disposition of her property. There was, therefore, no legal or moral wrong in suggesting to her, or even entreating her, to bestow her property upon their sons, either by will or by gift *inter vivos*. Such a disposition by gift was made, and, in my judgment, appellants thereby acquired all the rights of their mother.

From this resumé of the evidence it is obvious that the decree prayed for, viz., the transfer of appellants' stock to a receiver for payment of respondent's judgment, was properly denied. There was no evidence to rebut the presumption that the $2,400 acquired by her by the surrender of the policy of life insurance, was her own money. It follows that the shares of stock in the Taylor Provision Company or such interest therein as she acquired with that money became hers, and that she transferred her interest therein by the gift to appellants. The right of appellants to the shares originally taken and paid for by them is in no wise challenged.

The decree, however, subjects to respondent's judgment the accumulated earnings of the company which, upon division, would pertain to appellants' shares. In other words, it recognized the *bona fides* of the transaction by which such shares

were acquired, but decrees that the earnings upon the shares belong not to appellants but to John Taylor and are subject to his debts.

The evidence upon which the decree in this respect seems to have been made may be thus stated : The Taylor Provision Company engaged in the same business as that which the firm of John Taylor & Company had previously carried on.    John Taylor became the president and manager of the corporation.    It does not clearly appear but it may be inferred that the corporation owed its success to his business ability and exertions.    It appears, at least, that while he was, as the vice-chancellor finds, the controlling spirit of the company, it established a good business and has accumulated earnings of about $30,000.

From the opinion below, it seems that the conclusion respecting these earnings was based upon the lack of evidence to show any agreement between the company and John Taylor as to accountings, or compensation or profits.    But this put upon the defendants below a burden which ought not to have been imposed on them.    It was for respondent to establish fraud in the transaction.    As to accountings, it should be presumed, in the absence of proof to the contrary, that such accountings as shareholders may require from officers of corporations were provided for.    The mere fact of large undivided accumulations of earnings justifies no inference of fraud, because the shareholders had a right to leave their earnings undivided, and it may be inferred that there was a necessity for more working capital than that supplied by the original subscriptions.    In respect to compensation of the president and manager, there is obvious error, for the evidence shows that John Taylor is and has been receiving a salary of $3,000 a year as an officer of the company, for his services.

The decree, in so far as it subjects the accumulated earnings of the Taylor Provision Company which represent appellants' forty-eight shares of stock, to respondent's judgment, upon this evidence, is plainly erroneous.

In respect to such of the earnings as represent the two shares originally subscribed and paid for by appellants, the decree has

no foundation to rest upon. In respect to so much of the earnings as represent the forty-six shares subscribed for by the deceased Catharine M. Taylor, or such interest as she acquired therein by the money she actually paid thereon, it is also without support.

Under our Married Woman's act and the deliverances of our courts on the subject it is thoroughly settled that a married woman may embark her own money and capital in any separate business or trade ; may make valid contracts respecting the same ; may employ agents in carrying on such business or trade, and may avail herself of their skill and ability to make it successful. She may employ her husband as such an agent, and make use of his business ability, experience and energy to the same purpose. Earnings upon or increase of her capital in such business or trade, though due in part to the services rendered by her husband, will still belong to her and will not be liable to be seized by the husband's creditors as his property. This was the doctrine declared in the court of chancery by Vice-Chancellor Van Fleet and approved by this court in *Tresch* v. *Wirtz, 7 Stew. Eq. 124; S. C., 9 Stew. Eq. 356.* It was applied in the court of chancery in *Kutcher* v. *Williams, 13 Stew. Eq. 436,* and more recently in this court in *Coyne* v. *Sayre, 9 Dick. Ch. Rep. 702.*

Had Mrs. Taylor established a business such as was carried on by the Taylor Provision Company and invested in it the money acquired by her upon the surrender of the life insurance policy and employed her husband to carry on that business in the same manner as he carried on the company's business, this doctrine would have been plainly applicable. For, while a court of equity will carefully scrutinize the employment of an insolvent husband by a wife in such a case, it could find nothing in the facts to indicate that the husband acquired any interest in the profits or earnings of the business. Had the husband's services been rendered to her gratuitously, such would probably be the conclusion, for the debtor is not obliged to work for the benefit of his creditor, but when, as in this case, the services were rendered upon compensation, not shown to be unusual compensation for such services, it is beyond doubt that the profits

32

Taylor *v.* Wands.

and earnings of the business belonged to the wife, notwithstanding they were in part due to the husband's skillful services, precisely as they would do had she employed a stranger of like ability to carry on the business.

I am unable to distinguish between the case supposed and which the vice-chancellor concedes would require a different conclusion than that he reached, and the case actually presented by the evidence. Mrs. Taylor, instead of embarking her capital alone or in partnership with her sons in the business, organized a corporation to establish the business, and she and her sons took all the stock issued except one share and paid in all the working capital. Instead of employing her husband as her own agent or the agent of a firm composed of herself and her sons, the corporation, which they practically controlled, employed him as president and manager. The cases are identical and the profits and earnings represented by her stock were her own property and not liable to respondent's judgment.

There is nothing in the evidence to indicate it, but it may reasonably be inferred that a large part of the undivided earnings of the company were made after the stock of Mrs. Taylor had been transferred to appellants. With respect to the earnings after the transfer, the evidence is equally insufficient to justify the conclusion that they became the property of John Taylor.

For these reasons the decree in the respect under consideration was erroneous.

It remains to consider that part of the decree appealed from which set aside certain conveyances and subjected the lands thereby conveyed to the Taylor Provision Company and to Harry C. Taylor to respondent's judgment.

To support the judgment in this respect respondent's evidence must show that John Taylor was the owner of said lands or of some interest in them liable to be taken in satisfaction of respondent's judgment.

The only witnesses called upon this subject were John Taylor and Benjamin Van Cleve. Neither Edward H. Murphy nor any officer of the Mechanics' National Bank of Trenton was examined as a witness.

From the evidence of John Taylor the following facts appear: All the lands in question belonged to him at the time of the failure of the firm of John Taylor & Company, and the title was in him. The Mechanics' National Bank of Trenton was a large creditor of the insolvent firm. John Taylor conveyed the lands to Edward H. Murphy without any consideration, but with the intent that Murphy should convey them to said bank, which he afterwards did. There was no agreement or understanding with the bank, except that it was to credit upon the debt of the firm whatever moneys it should obtain by a sale of said lands.

If the evidence of John Taylor is believed—and he is the only witness called respecting the transfer of his title to the bank—it is plain that his conveyances were absolute, and conveyed all his right, reserving no right of redemption. If the peculiar manner in which the title was conveyed to the bank is adapted to excite suspicion of the *bona fides* of the transaction, such suspicion is not sufficient to justify the rejection of the sworn statements of respondent's witness, to the effect that the design was to prefer the bank to the other creditors of John Taylor. Such a preference is not forbidden by law.

Since it thus appears that John Taylor parted with all his interest in the lands upon the transfer to the bank, it is obvious that the decree can only be supported by evidence establishing the fact that he subsequently acquired the title to said lands or some interest therein.

The bank conveyed the lands to Van Cleve, who paid for them partly in cash and partly by a note, which he afterwards paid. Both Van Cleve and Taylor testify that after Taylor had heard that Van Cleve had agreed to buy the lands from the bank, he expressed a desire to redeem the property at some future time, but both deny, in the most positive terms, that there was any agreement or understanding by which Van Cleve was bound to permit such redemption.

If this evidence is credited, it is plain that John Taylor acquired no interest in said lands from Van Cleve. But it is argued in behalf of respondent that facts admitted by these witnesses are at variance with their evidence, and justify a

refusal to credit their denial that Van Cleve's purchase of the lands from the bank was for the benefit of John Taylor. The facts relied on are these : Van Cleve and John Taylor were old and intimate friends. The sales of the greater and more valuable parts of the lands made by Van Cleve to the Taylor Provision Company were made for prices which reimbursed him for his outlay in the purchase from the bank. The conveyance by Van Cleve of one tract to Harry C. Taylor was without consideration.

A theory deduced from such admitted facts will not justify discrediting the sworn evidence of unimpeached witnesses in respect to the intent and purpose of the respective conveyances, unless it is absolutely inconsistent therewith. I do not think such inconsistency appears.

With respect to the lands conveyed to the Taylor Provision Company, there is no sufficient evidence to show that the prices paid were below the fair market value at the time of the respective conveyances. The lands were conveyed to the company in which John Taylor had but a nominal interest as holder of one share of its stock.

With respect to the tract conveyed to Harry C. Taylor without consideration, it appears that it was heavily mortgaged. There is no sufficient evidence of the market value of the equity of redemption at the time the conveyance was made, but the fair inference is that it was very small. If John Taylor's friend, being protected from any loss upon his purchase from the bank, chose to convey to his friend's son this equity of redemption of trifling value, the inference that it was a gift is at least as reasonable as the inference sought to be deduced that the transfer was for the benefit of John Taylor. There is no evidence whatever that Harry C. Taylor accepted the conveyance with any agreement or understanding that he was to hold the tract for the benefit of his father.

Whatever suspicion the evidence on this subject may excite, it falls short, in my judgment, of establishing the claim of respondent. The decree, in the respect lastly considered, is therefore also erroneous.

The result is that the decree appealed from, in the two respects which have been considered, and which are all in which appellants have an interest, must be reversed.

*For reversal*—THE CHIEF-JUSTICE, DEPUE, GARRISON, GUMMERE, LIPPINCOTT, LUDLOW, VAN SYCKEL, BARKALOW, BOGERT, DAYTON, HENDRICKSON, NIXON—12.

*For affirmance*—None.