155 P.2d 1010

## LAUGHLIN v. LAUGHLIN.

### No. 4815.

Supreme Court of New Mexico.

Nov. 28, 1944.

Rehearing Denied Feb. 27, 1945.

Whatley & Garland, of Las Cruces, for appellant.

Edwin Mechem, of Las Cruces, for appellee.

BRICE, Justice.

This action was brought by plaintiff (appellant here) under the "Declaratory Judgment Act", 1941 Comp. § 25-601 et seq., to determine the rights and interests of the parties to certain real estate and upon such determination "to set over to the party or parties whom the court shall determine to be the owner or the owners of the same,"

their respective interests or shares therein. The appellant claims title to a half interest in a 97 acre farm by virtue of an alleged oral contract with appellee; and a half interest in a 14 acre tract of land, upon the theory that it was paid for by community funds, the parties being husband and wife.

The first question is whether the appellant is the owner of an interest in the 97 acre farm.

It is alleged by appellant, and his theory was supported by his evidence, that after marriage the parties entered into an oral agreement in which it was determined that defendant's (appellee's) land was not worth the mortgage indebtedness against it, that in fact the mortgagees refused to accept the land in settlement of such indebtedness; that the parties agreed they would undertake to pay off the indebtedness and improve the land by farming it, and when the encumbrances should be paid, each of the parties would be entitled to a one-half interest therein. It is this oral agreement that is the basis of appellant's claim to an interest in the 97 acre farm, which, appellant asserts, was fully performed by the parties.

The parties were married in 1921, and divorced during the pendency of this suit in the district court. The appellee, prior to marriage, was the owner and operator of the 97 acre farm situated in Dona Ana County, New Mexico. At the time the parties were married it was encumbered by two mortgages securing notes in the sum

of $3,000 and $5,000, respectively. During the years of 1922, 1923 and 1924 the farm was operated jointly by the parties; thereafter, with the exception of one year, it was leased to third parties.

The proceeds of the crops produced from the operation of the farm during the years mentioned were deposited in a bank in the name of appellant and used by the parties as a joint checking account. Out of these funds the parties paid $10,040.50 in settlement of appellee's debts and interest thereon, due on her two mortgage indebtednesses in the principal sums of $3,000 and $5,000 respectively, and interest thereon amounting to $2,040.58.

Upon the payment of the $5,000 indebtedness the parties caused the notes and mortgage to be assigned by the mortgagee to appellant. In apparent explanation of this transaction appellee executed, acknowledged and had recorded, a document entitled "Declaration of Lien" in which the execution of the five $1,000 notes secured by the mortgage on the 97 acre tract was recited, and then it is stated therein: "Whereas, my husband W. H. Laughlin has paid out of his separate funds to said the First National Bank of Las Cruces the full amount of the aggregate sums specified in said promissory notes, to-wit, the sum of $5000; in consideration of which said the First National Bank of Las Cruces has by its endorsement on said promissory notes in due form of law, assigned, transferred and made over all and singular said five promissory notes unto my said husband,

who in consideration thereof has become and now is the legal owner, entitled to the possession of the same and of the mortgage deed given to secure the payment thereof." It is further stated therein that the appellee, in consideration of the premises, and to secure her husband in the payment of the promissory notes in question, certified that appellant was "possessed of a lien in and upon" the 97 acres of land, subject to a $3000 indebtedness secured by a mortgage due another person, being the balance of the appellee's indebtedness which the parties likewise paid out of the funds mentioned.

Regarding this alleged agreement the trial court found as follows:

"That no agreement was made between the parties shortly after they were married, or, to-wit, in the first part of the year 1922, as claimed by plaintiff, to the effect that they would jointly farm and operate said real estate and improve it thereby to realize from the products thereof money enough to pay off said notes and mortgages, and that upon payment thereof that each party should own an undivided one-half interest in and to said real estate; and that no such agreement was ever made.

"That no agreement was made between the parties after said notes and mortgages were fully paid off, claimed by plaintiff to have been made pursuant to and in furtherance of the claimed agreement set out in the preceding finding, and being to the effect that said real estate was of the value of $10,000 and that plaintiff should have a

lien thereon in the amount of half of said value."

We have examined the record and are satisfied that there is substantial evidence in support of these findings of the trial court. Regarding the assignments of the notes and mortgages (admitted to have been executed by the mortgagees with the consent of the appellee) and the "Declaration of Lien" executed by appellee about twenty years ago, we need only state that the trial court found upon substantial evidence that they were made without consideration and were never intended to be binding on the appellee, and that we are bound by such finding. But in any event the appellant claims no lien on appellee's 97 acre tract of land by virtue of the assignments of the mortgages and the execution of the "Declaration of Lien" which has been described; but asserts that these assignments and the declaration in question *were made in "pursuance" of,* and presumably to secure the enforcement of, the alleged oral agreement which this action was instituted to enforce, and which the court found was never made.

These findings settle every issue tendered by the complaint. No right to a lien is asserted, nor is any claim made therein that appellant is entitled to re-imbursement for his part of community funds used in improving appellee's farm. The allegations of increased value in paragraphs 6 and 6½ were made in support of appellant's claim of title and not by way of claim for reimbursement for his part of com-

munity funds expended in improving appellee's farm.

It follows that the alleged oral agreement, the assignments of the notes and mortgages and the "Declaration of Lien," are eliminated from consideration; and with them goes appellant's claim of title to an interest in the 97 acre farm.

The question of appellant's right to a lien against appellee's farm for such expenditures was injected into the case by the parties, and decided against appellant below. It is presented here and argued pro and con in the briefs of the parties. Under the circumstances we will take cognizance of it as we would a cause of action duly pleaded. In re Field's Estate, 40 N.M. 423, 60 P.2d 945.

The trial court concluded that appellant was not entitled to a lien on appellee's farm to secure payment to him of any sum of money claimed to be due him on account of any expenditure of community funds in the payment of appellee's mortgage debts and for improving her farm, for the following reasons: (a) Because the funds used for such payments and expenditures were the separate funds of appellee; (b) if the appellant had in fact an interest in such funds, the small expenditures did not increase the value of the property, but such increase was the result of "natural causes;" (c) if any such funds were so used, in the absence of a contract providing for reimbursing the community (and no such contract was proved), it is conclusively presumed that such funds were a gift to the appellee.

The first question is whether the trial court erred in holding that the funds derived from the parties' farming operations on appellee's farm, with which appellee's mortgage debts were paid and improvements made, were all the separate funds of appellee. It was the opinion of the trial court that such funds were appellee's, by virtue of Sec. 65-304 N.M.Sts.Ann.1941, which is as follows: "All property of the wife owned by her before marriage and that acquired afterwards by gift, bequest, devise or descent, with the rents, issues and profits thereof is her separate property. The wife may without the consent of her husband convey her separate property."

It is the contention of the plaintiff that the labor, skill, industry, and ability of the parties belonged to the community, and that the portion of the income derived from the farm due thereto (which, it is asserted, was the larger part), belonged to the community.

The common law was adopted in New Mexico in 1876, the effect of which is stated in Beals v. Ares, 25 N.M. 459, 185 P. 780, 788, as follows: "When the Legislature in 1876 adopted the common law as the rule of practice and decision, the whole body of that law as limited in the case of Browning v. Estate of Browning, supra [3 N.M.(Gild.) 659, 9 P. 677], came into this jurisdiction. Where it found a statute counter to its provisions, it yielded to the

statute, but it gave way only in so far as the statute conflicted with its principles. In so far as was possible it operated in conjunction and harmony with the statutes. If the statute conflicted with it, it bided its time and upon repeal of the statute became again operative; in other words, the common law, upon its adoption, came in and filled every crevice, nook, and corner in our jurisprudence where it had not been stayed or supplanted by statutory enactment, in so far as it was applicable to our conditions and circumstances."

But it was further held in that, and in other cases, that in the construction of statutory law, adopted from foreign countries, we should look to the source for definitions and interpretation. Harrison v. Harrison, 21 N.M. 372, 155 P. 356, L.R.A. 1916E, 854; Beals v. Ares, 25 N.M. 459, 185 P. 780; State v. Chavez, 42 N.M. 569, 82 P.2d 900.

Our community property system is statutory, and with some exceptions, was adopted from the laws of Mexico and Spain as it existed at the time of the signing of the treaty of Guadalupe Hidalgo.

Our statutes have defined "community property," as indicated by Sec. 65-304, supra, by elimination, as follows:

"All property owned by the husband before marriage, and that acquired afterwards by gift, bequest, devise or descent, with the rents, issues and profits thereof is his separate property." 1941 Comp. Sec. 65-305.

"All other property acquired after marriage by either husband or wife, or both, is community property; but whenever any property is conveyed to a married woman by an instrument in writing the presumption is that title is thereby vested in her as her separate property. * * *" 1941 Comp. Sec. 65-401.

It is the rule of the Spanish law that all acquests and gains of the spouses from their separate, as well as community, property, belongs to the community, and this is the law of Texas, Idaho, Louisiana and the Territory of Puerto Rico. But the states of New Mexico, Arizona, California, Nevada and Washington by express statutes have provided that the rents, issues and profits of separate property are the owner's separate property.

It is a general rule in noncommunity property states that the rents, issues and profits of the separate property of the wife under the "married women acts" belong to her, although the earnings are partly due to the labor, thrift and good management of the husband. Taylor v. Wands, 55 N.J. Eq. 491, 37 A. 315, 62 Am.St.Rep. 818; and see annotations: 21 L.R.A. 629, 23 L.R.A.,N.S., 1124. But it has been held that the profits of such labor are liable for the husband's debts. Patton's Executor v. Smith, 130 Ky. 819, 114 S.W. 315, 23 L.R. A.,N.S., 1124.

The grafting of the latter rule upon the community property system of the states mentioned has caused no end of complications, arising principally from the fact that

rents, issues and profits of property are not attributable alone to the property itself; but in practically all cases the factor of management, labor and talent are of greater value, and the fruits of these belong to the community under the Spanish law.

Looking for interpretation to the Spanish law as it existed in Mexico at the time of the Conquest, which was the source of the community property system, it has been generally held that as the labor, management and skill of either or both spouses belonged to the community, that the change wrought by the innovation should be confined to that portion of the earnings and gains attributable to the use of the separate property, and this construction of the statutes is particularly emphasized in the more recent decisions. Gold v. Gold, 170 Cal. 621, 151 P. 12; Brodie v. Barnes, 56 Cal. App.2d 315, 132 P.2d 595; Caswell v. Caswell, 105 Cal.App. 475, 288 P. 102; Jacobs v. Hoitt, 119 Wash. 283, 205 P. 414; Steward v. Torrey, 54 Ariz. 369, 95 P.2d 990.

The application of this construction of the statutes to the earnings of either or both spouses attributable to his or their labor, skill and industry in general business where separate real property is not a factor involved, is practically settled by the decisions of the courts of those states in which by constitution or statutes the rents, issues and profits of separate property belong to the owner of such property; so that accumulations resulting from a combination of the use of separate property of a spouse with the labor, skill and industry of one or both of the members of the community should be equitably divided between the two. Katson v. Katson, 43 N.M. 214, 89 P.2d 524; Steward v. Torrey, 54 Ariz. 369, 95 P.2d 990; Witaschek v. Witaschek, 56 Cal.App.2d 277, 132 P.2d 600; Shea v. Commissioner of Internal Revenue, 9 Cir., 81 F.2d 937; Van Camp v. Van Camp, 53 Cal.App. 17, 199 P. 885; Pereira v. Pereira, 156 Cal. 1, 103 P. 488, 23 L.R.A., N.S, 880, 134 Am.St.Rep. 107; Gold v. Gold, supra; Fellows v. Fellows, 106 Cal. App. 681, 289 P. 887.

But the decisions of the courts applying the rule to the rents, issues and profits derived from the separate real property of one of the spouses through the labor, skill and industry of one or both of them, are not at all harmonious. We find no basis for any distinction in the application of the rule to rents, issues and profits derived from the operation and management of realty and that of personalty, and that was the conclusion of the Supreme Court of Washington in Brown v. Scofield, 124 Wash. 273, 214 P. 10, 12, in which that court stated: "The case (In re Buchanan's Estate, 89 Wash. 172, 154 P. 129), inferentially, would seem to make a distinction between the rents, issues, and profits of the separate real property and the profits arising from separate personal property; but we find there is no such distinction to be drawn, and find no authority supporting it."

The division of the earnings derived from the combination of separate real property and the labor, skill and industry of the spouses is much less difficult than that involving commercial transactions. Particularly is this true of farming operations by irrigation, as in this case. It is a matter of general knowledge that such land has a market rental value, either cash or by a division of crops, and that the tenant's labor and industry are of greater value as factors in the production of crops than that of the land used in combination therewith.

In the early case of George v. Ransom, 15 Cal. 322, 76 Am.Dec. 490, the Supreme Court of that state held that a legislative act providing that the rents, issues and profits of the separate property of the spouses belonged to the community, was unconstitutional in that it ran counter to Sec. 14 of Art. XI of the state constitution which provided "All property, both real and personal, of the wife, owned, or claimed by her before marriage, and that acquired afterward by gift, devise, or descent, shall be her separate property." The property in dispute was dividends from the wife's corporate stock.

In Lewis and Chard v. Johns et al., 24 Cal. 98, 85 Am.Dec. 49, the question was whether crops grown upon the wife's separate real property through the labor, supervision and management of the husband belonged to the wife. The court said in part: "That the husband cannot, by his management, supervision, or labor, acquire any interest in the estate itself, is conceded, and by parity of reason he cannot acquire any interest in the increase, for that is hers also, and upon the same terms—the latter being a corollary of the former proposition. There is no magic in the touch or manipulation of the husband by force of which separate is transformed into common property. If he acquires, as is contended by respondents, any right whatever as against his wife by virtue of his supervision and labor, it is not a right, in the nature of a lien, in the thing supervised, or upon which the labor is bestowed, but merely a right to compensation, and his creditors could only proceed by the process of garnishment. In the absence of an express agreement to that effect, there is no implied obligation on the part of the wife to compensate the husband for his services, and in either case there would be only an imperfect obligation which neither the husband nor his creditors could enforce."

The California court said, in George v. Ransom, supra: "We think the Legislature has not the Constitutional power to say that the fruits of the property of the wife shall be taken from her and given to the husband or his creditors. * * * This term 'separate property' has a fixed meaning in the *common law*. * * * It is not perceived that property can be in one, in full and separate ownership, with the right in another to control, and enjoy all of its benefits." (Emphasis ours).

It was the rule of the common law that the rents, issues and profits of the prop-

erty of both husband and wife belonged to the husband, whereas, under the Spanish-Mexican law, the rents, issues and profits of both separate and community property belonged to the community.

The fact that under the common law the "fruits" of the property would have belonged to the husband, or that the Spanish-Mexican community property laws were in force in California at that time, under which the wife could own separate property the "fruits" of which belonged to the community, seemed not to have been considered. This case is criticised in Principles of Community Property, by de Funiak, § 71.

It was held by the Supreme Court of California, in Diefendorff v. Hopkins, 95 Cal. 343, 28 P. 265, 267, 30 P. 549, that the earnings of a married woman in her operation of a boarding house without the assistance of her husband, which was established with her own funds, was her separate property. The court said: "To begin with, she owned the Pine Street house and lot, where she carried on a business which was hers exclusively, and in which her husband refused to have any part. The proceeds of such business were, therefore, her separate estate, as being the profits of her separate property. Civil Code, § 162. It is true that they may have been, to some extent, the profits of her labor and personal attention, but so must, in some degree, be the rents, issues, and profits of any separate estate of either spouse, and the wife must have the same right to manage her

separate estate, so as to turn it to profit, that the husband has to manage his separate estate. The proceeds of the business, therefore, belonged to her."

The case on which the appellee especially relies is In re Estate of Pepper, 158 Cal. 619, 112 P. 62, 64, 31 L.R.A.,N.S., 1092. Pepper owned as his separate property 291 acres of land on which he conducted a nursery business. He was engaged in no other business and devoted his entire time and energy to its conduct. In holding that the rents, issues and profits of this business were the separate property of Pepper, the court said: "Earnings, acquired by the exercise of the industry or skill of either husband or wife, are to be credited to the community. On the other hand, the products of land, separately owned by either spouse, and cultivated by either or both, become the separate property of the one owning the land. The appellant does not dispute the proposition that, if Pepper had, year after year, sown his land to grain, the resulting crops would have formed a part of his separate estate. But it is argued that, in the case of the nursery, the principal element in the success of the venture was the industry, skill, and attention of Pepper, and that the use of the land was merely incidental to what was, in effect, a commercial enterprise. We are unable to see that this argument furnishes a sufficient ground of distinction. In any agricultural enterprise, the labor and skill of man are essential to success. An orchard or a grain field must be cultivated and cared for. The resultant product is in part due to the

processes of nature operating upon the land, and in part to the intelligent application of manual labor to the soil. It is, in the nature of things, impossible to apportion the crop so as to determine what share of it has come from the soil and what share from the exertions of man. The product must be treated as a whole, and, if it is the growth of land separately owned, it is the separate property of the owner of the land."

The doctrine of this case is likewise criticised by de Funiak in his Principles of Community Property, § 72. He states: "The view taken by many of the courts is that each case must be determined with reference to its surrounding facts and circumstances and that therefrom must be determined what amount of the income is due to personal efforts of the spouses and what is attributable to the separate property employed. Dependent upon the nature of the business and the risks involved, it must be reckoned what would be a fair return on the capital investment as well as determined what would be a fair allowance for the personal services rendered."

The opinion in the Pepper case was written in 1910. Much of the law regarding the effect of the combination of the use of separate property with the labor and talent of a member of the community has been written by the courts of California since that time. In Butts et al. v. Russell et al. (In re Barnes' Estate), 128 Cal.App. 489, 17 P.2d 1046, 1047, the District Court of Appeals of California quoted from the Pepper case, but the basis of its conclusion was different, as will be seen from the following quotations therefrom:

"But the record does show that the deceased had no other sources of income than the rents, issues, and profits of the property owned by him at the date of marriage; that he was not engaged in any business except looking after and caring for the properties which he owned. * * *

"The record here shows that the deceased received rents, issues, and profits from the different tracts of land, other than city property owned by him at the date of his marriage, but the record is silent as to how much of the profits realized from such sources were due to the exertions of the deceased, and how much attributable only to the land. So far as we have been able to ascertain from the record, the trial court was justified in coming to the conclusion that the deceased did but little farming, but leased the different tracts of farming land owned by him during the entire period of coverture and collected rents therefor. * * *

"While the court (in the Pepper case) goes on to state that the nursery required skill and industry and attention on the part of Pepper; that any agricultural enterprise requires the labor and skill of some one to insure success; that the resultant product is in part due to the processes of nature operating upon the land, and in part to the intelligent application of manual labor to the soil; that it is, in the nature of things, impossible to apportion the crop so

as to determine what share of it has come from the soil and what share from the exertions of man. The product must be treated as a whole, and, if it is the growth on land separately owned, it is the separate property of the owner of the land.

"In the case at bar, the facts disclosed but little, if any, application of labor on the part of the deceased to the farming land owned by him as a part of his separate estate, but, on the contrary, that such lands were rented by him to others."

It seems from the foregoing that it was the view of the District Court of Appeals that if the husband had farmed the property that the community would have been entitled to that portion of the earnings attributable to his labor, and talent, notwithstanding the quotation from the Pepper case.

In the case of Gold et al. v. Gold (In re Gold's Estate), supra, decided in 1915, the question was whether the profits of a saloon and gambling business owned by the husband before marriage and operated after marriage were community property. The California court stated [170 Cal. 621, 151 P. 13]: "The plaintiffs claim that Gold's share of the partnership profits made after the marriage became Gold's separate property by reason of the fact that the partnership was formed prior to the marriage. Where a business has been carried on and capital has been invested therein before marriage, the entire profits therefrom, after marriage, are not necessarily separate property of the husband. The rules regarding

the character of such property were considered in Pereira v. Pereira, 156 Cal. 1, 103 P. 488, 23 L.R.A.,N.S., 880, 134 Am.St. Rep. 107. The principle there stated is that the interest of the husband in the capital of the partnership, as it was at the time of his marriage, is the husband's separate property, and that the question what part of the subsequent profits arises from the use of this capital and what part from the personal activity, ability, and capacity of the husband is to be determined by the court from the circumstances appearing in the case, that whatever accrues from the latter source is community property, and that the remaining profits must be classed as separate estate. The plaintiffs are in error in their contention that the court erred in not declaring all the property derived from the profits of the partnership after marriage to be separate property."

On this question it was stated in the Pereira case (referred to in the Gold case) regarding the right of the husband's separate estate to share in the profits of a business owned by him before marriage, the operation of which was continued after marriage [156 Cal. 1, 103 P. 491]: "This capital was undoubtedly his separate estate. The fund remained in the business after marriage and was used by him in carrying it on. The separate property should have been credited with some amount as profit on this capital. It was not a losing business, but a very profitable one. It is true that it is very clearly shown that the principal part of the large income was due to the personal character, energy,

ability, and capacity of the husband. This share of the earnings was, of course, community property; but without capital he could not have carried on the business. In the absence of circumstances showing a different result, it is to be presumed that some of the profits were justly due to the capital invested. There is nothing to show that all of it was due to defendant's efforts alone. The probable contribution of the capital to the income should have been determined from all the circumstances of the case, and, as the business was profitable, it would amount at least to the usual interest on a long investment well secured."

The Supreme Court of Nevada in Lake v. Lake (Lake v. Bender), 18 Nev. 361, 4 P. 711, 728, 7 P. 74, stated the rule in that state as follows: "And in this or any other case, if profits come mainly from the property, rather than the joint efforts of the husband and wife, or either of them, they belong to the owner of the property, although the labor and skill of one or both may have been given to the business. On the contrary, if profits come mainly from the efforts or skill of one or both, they belong to the community. It may be difficult in a given case to determine the controlling question, owing to the equality of the two elements mentioned, but we know of no other method of determining to whom profits belong."

This rule would seem to deny the owner of the property any part of the income therefrom, if derived *mainly* from the labor, skill, and management of a member of the community; and would deny the community any interest if produced *mainly* by the property itself, upon the ostensible theory that such income could not be divided. This rule seems to have been followed by the Supreme Court of Arizona in Steward v. Torrey, 54 Ariz. 369, 95 P.2d 990, in which it was held that all of the income from a restaurant, which was the separate property of the husband, belonged to the community, notwithstanding the statutes of that state provide that the rents, issues, and profits of the separate property of the spouses belong to its owner.

Our community property law chiefly was adopted from the State of California, and in Katson v. Katson, supra, we followed the decisions of the California courts in holding that the community was entitled to that portion of the income derived from the labor, industry, and skill of the husband, but that he, as the owner of the business, was entitled to that portion of the income produced by it.

We are satisfied with this conclusion of the California courts, but we cannot follow those courts in holding that this rule does not necessarily apply to real property. In re Pepper's Estate, supra.

We are unable to agree to the following statement in the Pepper case: "It is, in the nature of things, impossible to apportion the crop so as to determine what share of it has come from the soil and what share from the exertions of man. The product must be treated as a whole, and, if it is the growth of the land separately owned,

it is the separate property of the owner of the land," which no doubt has been a rule of property in California since George v. Ransom, supra.

The only assets of a community at its inception are the labor, skill, industry and talents of the spouses. The community owns no property, and could never own any, under the theory of the trial court, if the business carried on is farming separately owned lands of one or both the spouses. If a husband at the time of marriage owned, say, a thousand acre farm that required all his time, industry and talent to operate, the community would never own a dollar's worth of property. The husband could accumulate separate property from its usufructs and by will dispose of to others the original lands and all accumulations, and the wife would be without remedy. She might labor on the farm, bear children and spend a life of practical serfdom with no hope of accumulating any property she could call her own, or legally claim an interest therein.

The views here expressed have the approval of no less an authority than Professor Pomeroy, as stated in an article written by him and published in 4 West Coast Reporter 193 (1894), from which we quote as follows:

"All the decisions which have discussed the nature of community property agree in stating this fundamental theory; that all property, not falling within the definition of separate property, acquired after the marriage by the labor either of the husband or of the wife, *is nevertheless deemed to be acquired by the labor of both the spouses.* Upon this theory the wife of the mechanic is legally deemed to contribute *her* share of labor, skill, and industry in earning *his* wages, which are therefore community property. The wife of a lawyer or of a physician is legally regarded as jointly aiding in earning his professional increase. The wife of a clergyman, professor, or public officer, is legally regarded as earning a joint portion of his salary. The wife of a merchant or of a *farmer* is legally regarded as assisting in his business and as contributing to increase its profits. This theory is applied without exception, whether as a matter of fact the wife does assist in carrying on the husband's business and in thus actually increasing its proceeds, or whether her attention is solely confined to the domestic affairs of the household, or even when her attention is solely directed to spending the money which her husband makes. This theory should never be lost sight of. The code nowhere makes the community property to depend upon the fact that the *joint* labor of the two spouses *actually* produced it; their *joint* labor may be theoretical as well as actual.

\* \* \* \* \*

"I cannot believe, however, that the phrase, 'rents, issues, and profits' as thus used in the code, is intended to include *any* of the increase and products, made by a husband in carrying on a business, in which he is constantly buying and selling and exchanging, and is using his own labor and skill in producing the increase from his

separate property, as his original capital. Otherwise there could hardly ever be any community property, where the husband had a separate estate at his marriage, if the provision of the code should be so construed. The phrase, 'rents, issues, and profits,' is undoubtedly a broad one; but its true meaning is only to be ascertained by a reference to other parts of the general system, established by the code, and especially by a reference to the limitations, imposed by the provisions, concerning community property. * * *

"The 'rents, issues, and profits' of the separate estate, which are intended by the code to remain separate property, should be confined to those proceeds which arise, without the husband's *active* use of the separate property, as a capital, in carrying on some business, trade, or profession, and, therefore, without the husband's *direct* labor as the agency or means for their production. Familiar illustrations are the rents, arising from lands belonging to his separate estate, which have been leased; the dividends, and other such income, which arise from funds belonging to his separate estate, which are invested in stocks, government bonds, and other like securities; interest arising from monies loaned upon notes, mortgages, and the like, and all similar forms of income and profits, which do not result from the husband's labor, directly expended in producing them.

* * * * *

"The following rule seems to possess all these qualities. Suppose, for simplicity and clearness of statement, the husband at his marriage had a separate estate of $10,000, which he used as the capital in his business. Carrying on a business with this capital, he dies leaving a total property of $60,000, and there has been no other property or source of property during the marriage. As the original $10,000 of separate estate is included in this total sum, and as it continues to be the husband's separate estate, it should of course be deducted. Is the residue $50,000 all separate property, or all community property? In my opinion it is all of neither kind, the only fair, equitable and practical rule to determine the portions which belong to each kind is substantially as follows: A sum which would equal the income upon the original separate estate ($10,000) if invested at a fair, reasonable average rate of interest during the entire period of the marriage, would represent the portion of this entire increase which belongs to the separate estate; the balance, being due to the husband's labor, and therefore, in contemplation of the law, to the labor of both the spouses, would represent the portion belonging to the community property."

Mr. Evans, in an article published in 10 Cal. Law Review, reaches the same conclusion. Regarding the Pepper case he says: "The diversity in results as well as the injustice in some of the cases suggests that no satisfactory rule has been worked out so far. It does not seem difficult to suggest a convenient way out in such situations as the Pepper case presents. The amount attributable properly to rents, is-

sues, and profits is the mesne profits, or perhaps the reasonable rental value of the premises. While this might not be wholly accurate, it is approximately so, and would be all that could be recovered from a disseisor. A like approximation should be made where the husband devotes his time to cultivation and improvement of his wife's property. Two courses may be open; one, to determine the reasonable value of his labor and industry, the other to subtract the reasonable rental value from the actual income from produce. Whichever course were adopted, the result should approximate the community interest. How the family and other expenses should be apportioned would depend on the facts of each particular case. In cases where there have been small or no net profits or even losses in the aggregate, over a period of years, there should be no presumption that the losses were on the side of industry as compared with capital but the result should depend on the actual facts, as to the value and productiveness of the separate property as well as of the labor expended. The husband being the manager of the community property should exercise the highest good faith toward the community interests. He is a sort of fiduciary. Louisiana puts the burden of proof on him, in the cases of this kind, to show that a part of the profits arises from separate property and how large that part is."

No great difficulty will be encountered in apportioning the earnings between the owners of the two estates. Each case will depend upon its own facts; a situation often encountered by trial courts. Mathematical exactness is not expected or required, but substantial justice can be accomplished by the exercise of reason and judgment in all such cases.

It is our view that the products of the soil need not necessarily "be treated as a whole." The community is in effect a tenant of the owner of the land, and irrigated farming land in this state has a market rental value, and that value is the portion of the income attributable to the land; the remainder was produced by the efforts, skill, and management of the community. If there is no market rental value, then an equitable division may be made by some other rule, such as was suggested by the Supreme Court of California in Pereira v. Pereira, supra. The statute does not differentiate between real and personal property, and we should not do so. We feel bound by the rule, but not to withholding its application to real property as in the Pepper case.

We conclude (a) the appellee as the owner of the land was entitled to its rental value either in cash or in the proceeds of crops sold from it; (b) that the community was entitled to the balance of the income produced from the lands by the labor, skill, and management of the parties.

As the mortgage notes were paid, and the improvements on appellee's farm were made, with the proceeds of crops grown on appellee's farm by the parties, it follows that the trial court erred in hold-

ing that the mortgage notes and improvements were paid wholly with appellee's separate funds.

▮▮ The proceeds of the crops grown on appellee's farm were not all community property, as appellant asserts; nor were they made so by the commingling of funds. Those funds were deposited in a bank and never apportioned between the owners. It would not have been difficult at the trial to have determined the amount belonging respectively to the community and to the appellee. According to appellant's testimony the gross proceeds derived from the sale of the crops for the years it was farmed by the community were $19,596.99. This sum was deposited in a Las Cruces bank; and out of it $10,040.58 was paid to liquidate appellee's debts. Assuming, for the purpose of illustration, that the rental value of the farm was one-third of the proceeds of the crops produced thereon, the appellee was entitled to $6,532.33 as rents, issues and profits from her farm. It would follow that the community paid $3,508.66 of appellee's debts; not the full amount as contended by appellant. Of course the rental value may have been more or less than one-third of the proceeds derived from the sale of crops, and the interests of the parties would vary accordingly. But it will be presumed that the mortgage debts were paid out of appellee's separate estate to the extent of her available funds in the bank account that could have been traced and separated from the community funds. White v. White, 26 Cal.App.2d 524, 79 P.2d 759; Guye v. Guye, 63 Wash. 340, 115 P. 731, 37 L.R.A.,N.S., 186.

▮ The appellant offered testimony tending to prove the value of the labor, talent and industry of the parties in making the crops grown by them on appellee's farm, in attempting to establish the community's interest in the funds derived from the sale of the crops; but, upon the theory that all of such proceeds belonged to the separate estate of the appellee, the trial court excluded the offered testimony. The question of the correctness of this ruling was not presented here by assignment of error or argument; and cannot be reviewed by us. The burden was upon appellant to establish the amount of community funds that were used in paying the mortgage debts and in making improvements on the appellee's farm before a lien (if he is entitled to a lien to secure his reimbursement) could be impressed. No such finding was made and no evidence was introduced to establish such fact.

The trial court found that the increase in value of appellee's farm was from "natural causes," and not by reason of any improvements placed thereon. The finding is supported by substantial evidence, and will not be disturbed.

Digressing for the moment, we are advised from appellant's testimony that from the year of 1926 to 1940, inclusive (fifteen years), appellant deposited the rents, issues and profits from appellee's farm in a joint bank account upon which he drew at

will; but kept to himself a large separate income from oil royalties. We are satisfied that appellant is far ahead in his financial transactions with appellee.

Regarding the small tract of land in which appellant asserts an interest, the Court made the following finding of fact: "That a certain tract of land and real estate, 13.94 acres in area, and adjoining the premises set out in Finding No. 1 above, and also involved in this case, was acquired while the parties were married, to-wit, on March 21, 1932, when a patent thereto was issued to the Defendant by the United States Government, same having been recorded and appearing of record in Deed Record No. 84, at page 540, Records of Dona Ana County, New Mexico; that the statutory presumption that said tract, so acquired in the name of Defendant, became the separate property of the Defendant, has not been overcome by the evidence; that the issuance of said patent was based on Government scrip, and that such scrip was purchased by Defendant and that the cost thereof, and other expenses incurred in acquiring said scrip were paid for by Defendant out of her separate funds; and that Defendant has not conveyed away her ownership in said tract."

 It is provided by statute that "Whenever any property is conveyed to a married woman by an instrument in writing the presumption is that title is thereby vested in her as her separate property." Sec. 65-401, N.M.Comp.1941. This presumption is not conclusive but may be overcome by proof. It is under this presumption that the trial court held that title was in appellee.

 Property acquired in community property states takes its status as community or separate property at the very time it is acquired, and is fixed by the manner of its acquisition. Woods v. Naimy, 9 Cir., 69 F.2d 892; Leinnewebber v. George, Tex.Civ.App., 95 S.W.2d 478; Wilson v. United States, 9 Cir., 100 F.2d 552. If property is acquired by the wife it is her separate property at that very time, and the fact that a part of the purchase money is later paid out of the community or separate estate of the other spouse does not alter such status. Colden v. Alexander, 141 Tex. 134, 171 S.W.2d 328; White v. Hebberd, Tex.Civ.App., 89 S.W.2d 482; Merritt v. Newkirk, 155 Wash. 517, 285 P. 442.

 If the appellee personally bought the property by the use of her own credit then it is her separate property. This question was decided in Morris v. Waring, 22 N.M. 175, 159 P. 1002. The syllabus reads: "Sections 2757, 2758, 2759, 2762, 2764, 2765, Code 1915, interpreted, and held that property purchased by a married woman with money borrowed upon her own personal credit, and which money is repaid out of her separate estate, is her separate property."

This does not exactly state the point decided, but Justice Parker, writing for the court, said:

"In essentials the purchase of property by a married woman, under statutes like ours, with money borrowed on her individual credit, is an exchange of separate property for separate property. The husband alone can contract a common debt; therefore the wife's creditor looks alone to the wife's credit for repayment. This credit of the wife is usually based upon the property which she had prior to marriage, or which she acquired afterwards by gift, bequest, devise, or descent. But suppose the wife brings into the marriage community no separate estate and afterwards acquires none in the ways mentioned in the statute. All that she has under such circumstances is her credit. This credit is not an asset of the community, for she is in no way liable for the community debts. This credit must belong to the wife as her sole and separate property, and she brings it into the community and it must necessarily remain her separate property. * * *

"It seems perfectly clear to us from what has been heretofore said, and upon the reasoning in the Texas and California cases, that money borrowed by a married woman upon her own individual credit remains her separate property, and that likewise, property purchased with such money remains her separate property."

Appellant contends that in 1934 (the year in which this property was bought) the community and separate funds had been so commingled that they could not be separated and the trial court so found. There is testimony, however, to the effect that appellee borrowed this money on her own credit. She did first state that the parties hereto signed a note to the Mesilla Valley Bank and borrowed the money thereon, but later she testified as follows:

"The Court: Do I understand $500.00 was borrowed from the Cotton Finance?

"Witness: Yes, sir.

"The Court: In what form?

"Witness: $500.00 was borrowed and deposited, four eighty-five, in the bank down here at Mesilla Valley. They sent a draft out to Casa Grande or a check or a draft or a check out there and we sent it back to the Mesilla Valley Bank.

"The Court: I am just trying to get this cleared up. As I understand it, the Cotton Finance loaned you $500.00.

"Witness: Yes, sir.

"The Court: Now, what I am trying to get at is this: At the time that was borrowed, was it borrowed for the purpose of acquiring this 13.94 acres?

"Witness: Yes, sir.

"The Court: I assume prior to that time you had conferred with Shannon or people who knew something about that and decided you would need about $500 in order to fully acquire that 13.94 acres. Is that right?

"Witness: Yes, sir."

It is totally immaterial whether appellee paid for the property out of her separate

estate, as found by the trial court, or whether it was paid for out of the community estate. If, in fact, it was bought on her credit or with funds obtained by her on her credit, at that instant it became her separate property. If paid for by the community, she was indebted to the community in the amount paid.

 Appellee testified in effect that at the time this money was borrowed the 97 acre farm called "Fair Acres" was leased, and that the money borrowed was repaid from the rents. The rents of her individual property were her separate funds. According to her testimony, she borrowed the money on her own credit, and it was paid back out of her separate funds, as found by the court. The trial court did not err in holding that the 14 acre tract of land was appellee's separate property.

The declaratory judgment of the district court should be affirmed, and it is so ordered.

SADLER, C. J., and MABRY and THREET, JJ., concur.

BICKLEY, Justice (concurring in part).

I concur in the decision that the trial court committed error, as disclosed in the opinion. This error is so basic that its correction might involve a substantial change in the course of the presentation of the case to the trial court and its decisions therein, hence I am unwilling to share the responsibility of rendering the further decision finally disposing of the case on the present record, notwithstanding the error. The judgment should be reversed and the cause remanded for further proceedings.

On Motion for Rehearing.

BRICE, Justice.

All issues decided by the district court were sufficiently supported by facts and authority except those involving the question of whether an equitable lien in favor of appellant should have been impressed upon the appellee's farm called "Fair Oaks", to secure his part of funds admittedly expended by the community to discharge appellee's separate mortgage debts.

We refused to order a new trial because there was no evidence in the record from which the trial court could determine either the rental value of the farm in question or the value of the labor, skill and industry of the spouses in farming the land; and no finding of fact made would support a decree impressing such lien.

 Appellant asserts that if the trial court had not erroneously excluded from the evidence an audit prepared from the books, checks and other documents kept and made, reflecting such operations, the evidence would have disclosed these necessary facts. We have carefully examined the audit, and find that it discloses the amount obtained from the proceeds of crops for the years 1921 to 1939, inclusive, but does not (and probably could not) disclose the amount thereof belonging to the appellee as rental value of the farm and

the amount earned by the labor, skill and industry of the spouses. The audit should have been admitted as evidence. It tended to prove the income derived from the farming operations; but with it, the appellant failed to make a case. If the equities in favor of appellant would justify the disposition of the case proposed by Mr. Justice Bickley in his separate opinion we would follow that disposition of the case. But upon examination of the whole record, it seems evident that a new trial would not change the result.

▪▪▪ A proceeding to impress such lien is purely equitable and equitable principles apply. Now the evidence of both appellant and appellee, together with the tendered audit, show that the community received all of the proceeds of the farming operations from 1921 to 1939 (except the sum of $10,040.58 paid to settle appellee's mortgage notes), amounting to many thousands of dollars. This included appellee's separate funds, to be measured by the rental value of the farm. If the community is entitled to receive any remuneration for the payment of the mortgage debts, the community must do equity and give appellee credit for her funds which appellant commingled with the community funds for eighteen years. If the amount of the rental value of this property can be ascertained for the years in which the proceeds of the crops were applied to the payment of the mortgage debt, it no doubt could be ascertained for the subsequent years in which appellee's farm was rented to a third person, and during which she was entitled to all the proceeds. This rental value could be set off against any claim appellant might have for his part of the community funds paid to settle appellee's separate mortgage debts. We were so well satisfied that the community has been much overpaid and that the trial court would so hold, that we were of the opinion originally that it would be futile to send this case back for a new trial on this question, and the appellant's brief on rehearing has not convinced us that our original conclusion was not correct. According to the testimony of appellant, he had complete control of the proceeds of the farming operations during all these years and deposited all to the community. He should have kept appellee's funds separate from the community funds. The fact that such commingling constituted the whole fund community property does not affect the case. The community, we are satisfied, was enriched by many thousands of dollars of appellee's separate funds, of which appellant claimed half interest.

Under these facts the appellant should be required to do equity. Appellee would at least be entitled to set off against any claim appellant has for community funds used in paying the mortgage debts an equal amount of her separate funds turned over by appellant (who had control of them) to the community. White v. White, 26 Cal. App.2d 524, 79 P.2d 759.

In an exceptional case we reluctantly exercised our inherent powers to protect fundamental rights, and to that end de-

parted from the rules of practice binding on the parties, Gonzales v. Rivera, 37 N. M. 562, 25 P.2d 802; but this case calls for no such exercise of power.

The motion for a rehearing should be overruled. It is so ordered.

SADLER, C. J., and MABRY, J., concur.

LUJAN, J., did not participate.

BICKLEY, Justice.

For the reasons stated in special concurrence in original opinion, I favor granting rehearing.