269 P.2d 737

**HONIG v. HONIG.**

No. 5855.

Supreme Court of Arizona.

May 3, 1954.

Bumsted & Linsenmeyer, Phoenix, for appellant.

McKesson & Renaud, J. Gordon Cook, Phoenix, for appellee.

UDALL, Justice.

Plaintiff, Mary Ida Honig, filed suit for divorce from her husband, Joseph Honig, appellant here. Community property of the parties consisted of a tract of improved realty and the furnishings therein, estimated to be worth from $10,000 to $20,000 and $2,000 worth of corporate stock. The court granted the divorce, and as to the property decreed that the husband should have $250 and the wife should have the rest. The husband appeals from the decree, attacking this division of the property as grossly unfair, inequitable and a manifest abuse of discretion.

There is some small conflict in the evidence and of course all conflicts will be resolved in favor of the plaintiff-appellee. It is necessary to set forth the facts in some detail for proper understanding of the basis for the lower court's decree. The parties were married in San Francisco, California, November 21, 1930. Joseph Honig was about thirty-two years of age and Mary was about twenty-two. They soon discovered that Joseph was unable to earn a living in California and arrangements were made for their return to Minneapolis, Minnesota, where the plaintiff's father owned and operated a lumber yard. Joseph began working at the lumber yard and for about three years he received no salary but did receive room and board for himself and his wife. Their son, Allen, was born in 1932, and the second son, David, was born in 1935. When Joseph did begin to receive a salary it was at the rate of $20 a week and continued at that rate until sometime in the late 1930's when he began to receive $25 a week. Plaintiff's father gave the parties a down payment for a home and furnished the same for them. This was the "Humboldt Street" property and will be referred to hereinafter. The parties also bought a duplex in Minneapolis for rental purposes.

After the year 1939 the parties began to lead separate lives, and in the interests of clarity we shall relate first the actions of the wife, then those of the husband. Plaintiff's health is bad; she has been afflicted with arthritis since childhood and to ease the pain from this the administration of

morphine is occasionally required, and, she has suffered from asthma. In 1939 she and her son David came to Arizona for her health, and they later returned to Minnesota. Late in the year 1940 she returned to Arizona with both sons and $1,000. She purchased a home at 908 N. 4th Street, in Phoenix, paying $475 down, assuming a first mortgage of $2,000, and giving a second mortgage of $500. With the balance of the $1,000 she purchased furnishings for the home. To secure an income to support herself and her children she immediately began renting rooms and taking in boarders. In 1941 she secured a Valley National Bank loan and built a bungalow on the property, the rent from which paid off the loan.

In September, 1942, her husband came to Phoenix to live, and at his insistence, in early 1943 she discontinued renting rooms and taking in boarders. About November, 1943, she began work for Goodyear Aircraft Corporation and worked there all during 1944 and the first two months of 1945. After she left Goodyear she began working for United Producers and Consumers Cooperative, and has worked there steadily ever since.

In the early part of 1946 plaintiff "converted" the house so that there were three separate apartments therein, and with the bungalow which she had built in 1941 there were now four separate living quarters. The income from the rentals was sufficient to pay the taxes, the expenses of keeping the property in good repair, the electric, gas, water and telephone bills, and give the family a rent-free home.

From June, 1947 to June, 1948 plaintiff maintained her younger son, David, in a military academy, paying therefor the sum of $150 per month. From her earnings at work she was able to save up enough money to purchase approximately $2,000 worth of corporate stock. At the time of trial she was maintaining her son, David, in high school in Minneapolis, Minnesota, paying therefor the sum of $27 per week.

As for the defendant, in 1940 he borrowed $1,000 from the Morris Plan in Minneapolis, and this was the money that plaintiff used to purchase the Phoenix property. Until September, 1942, he remained in Minneapolis, living with plaintiff's parents, collecting his weekly wage of $25, and collecting the rents from the Humboldt Street property and the duplex. He sent no money whatsoever to his wife to aid in supporting her or the children, but he did pay off the Morris Plan loan. At some time during 1942 he sold the Humboldt Street property, from which there was realized a net amount of $1205. Three hundred ninety dollars of this was used to pay off the second mortgage on the Phoenix property, and the balance was banked.

After coming to Phoenix, defendant worked for Sears Roebuck for 90 days, then became employed at Goodyear Aircraft Company, and during the year 1943 earned $1180, which he contributed to the

support of his family. The duplex in Minneapolis was sold in 1943, from which the parties realized the sum of $408, which was banked. During 1944 he worked for Keyston Brothers and earned $800. He spent one week in the real estate business with no results, and then went into the insurance business where he "lost everything", that is, he lost all the money the parties had in the bank, together with a certain unknown amount of money which he had received from the estate of his deceased father. While in the insurance business he contributed nothing to the support of the family.

In July, 1945, defendant pulled up stakes and disappeared, later turning up at Mare Island, California. For three weeks he sent $50 each week to his family, and then the payments ceased and he was not heard from again until the summer of 1946, when his whereabouts was discovered through letters he had sent to his sons. Plaintiff at this time was very sick with asthma, and at the request of her parents, defendant returned to Phoenix to be with her. He stayed with her about a month, then dropped out of sight again. Six weeks later, August 20, 1946, he returned and spent the night at the family home, sleeping in the room with his son David who was extremely ill with a liver infection. When defendant arose in the morning he left the home and went to the bank, where he withdrew $250 worth of United States bonds from the family safety deposit box. He left town without a word

and was not heard from again until sometime in 1948.

In the fall of 1948 he returned to Phoenix to be present at the confirmation of his son, David. He was penniless and did no work while in town. In January, 1949, he disappeared again. David hitch-hiked to California to see him in May, 1951, and he sent David home, paying his bus fare to the city limits and telling him to hitch-hike from there. He literally "put him (David) on the highway without a nickel".

Defendant returned to Phoenix in June, 1951, still penniless and out of work. He lived at the family home, though he and plaintiff did not cohabit as man and wife and had not done so since the summer of 1945. In the spring of 1952 he began to use physical abuse on plaintiff and call her vile and obscene names during arguments, much of which was seen or heard by the neighbors. On June 11, 1952, the complaint for divorce was filed, and he was ordered by the court to leave the premises.

The record shows that for his own purposes, in June 1952 defendant borrowed a total of $756 from two banks, giving therefor two promissory notes. He signed plaintiff's name to the notes without her knowledge or consent. The notes were defaulted and an attachment lien has since been levied on the family home by the creditor. Also during June he cashed in his son's insurance policy, paid for by plaintiff, and used the proceeds thereof to buy him-

self an automobile. He admitted at trial that his total financial contribution to the support of his wife and sons from January 1943 to the time of trial in April 1953 was about $2,152.50. At time of trial defendant was employed by a furniture store and earned approximately $89 every two weeks. A large part of his salary was used to pay off personal obligations in the sum of $2,000 which he had incurred. Defendant testified that he thought a fair and equitable division of the property would be to give him "half of the income of the three apartments, nothing from the apartment in which she lives, half of the A. T. & T. stock".

In the decree the court granted plaintiff a divorce and provided that each party should bear his own attorney's fees and costs. No alimony was decreed, plaintiff was given custody of the minor child, and defendant was not required to contribute to his support. Plaintiff received all the real and personal property of the parties, save for $250 cash decreed to defendant.

■ The court's power to dispose of the community estate of the parties to a divorce action is defined in Section 27–805, A.C.A.1939:

"On entering a decree of divorce the court shall order such division of the property of the parties as to the court shall seem just and right, according to the rights of each party and their children, without compelling either party to divest himself or herself of the title to separate property. * * *"

This statute confers upon the trial court a very broad discretionary power, "and it is only where it clearly appears that it has been abused that this court is justified in interfering. * * *" Malich v. Malich, 23 Ariz. 423, 204 P. 1020, 1023. The judgment of the court is to be exercised in accordance with the statute, supra, and not to the end that one party be rewarded or that the other party be punished. Porter v. Porter, 67 Ariz. 273, 285, 195 P.2d 132. Moreover, it is well not to lose sight of fundamental principles, and we should bear in mind that the foundation of the community property system is the marital relation. Pendleton v. Brown, 25 Ariz. 604, 221 P. 213.

■ An examination of the entire record in this case shows defendant was unwilling to cope with the realities of life, and shamefully disregarded his marital duties. It is apparent that if it had not been for plaintiff's labors, and her frugality and business sense, there would have been little or no community property to be the subject of controversy in this litigation. We hold the trial court did not abuse its discretion in awarding to the plaintiff the "lion's share" of the community property, and the defendant got his just deserts. One cannot expect to reap in fields where he has never sown.

Judgment affirmed.

PHELPS, C. J., and STANFORD, LA PRADE and WINDES, JJ., concur.