432 P.2d 896

Marion E. NACE, Appellant,

v.

Harry L. NACE, Jr., Appellee.

No. 1 CA–CIV 449.

Court of Appeals of Arizona.

Oct. 30, 1967.

Rehearing Denied Dec. 19, 1967.

Review Granted Jan. 30, 1968.

Lewis Roca Beauchamp & Linton, by John J. Flynn, Robert A. Jensen, Roger W. Kaufman, Phoenix, for appellant.

Cavness, DeRose, Senner & Foster, by Jack C. Cavness and John W. Rood, Phoenix, for appellee.

MOLLOY, Judge.

This appeal and cross appeal question the property division made by the trial court in a divorce action. The questions presented are mixed ones of fact and law and pertain to business properties which the husband owned as separate property at the time of the marriage but which were operated by him during the marriage so that the properties increased considerably in value. The husband questions the holding of the trial court that the increase in value is community property and the wife complains that she was not given a proper share of this community property.

The parties were married on June 1, 1956. For some twenty years prior to that, the husband had been involved in the management of a chain of moving-picture theaters known as the "Nace Circuit," a business founded by his father. At the time of his father's death in 1953, the husband owned a substantial interest in the corporations and partnerships which controlled this circuit, and in 1958, during the marriage, the father's interest in this circuit was distributed from probate to the husband. In addition to the theater chain, there were two "investment corporations" as to which the husband thus came into ownership, in addition to certain business and residential realty. There are findings of fact by the trial court that six months prior to this marriage the defendant had a personal net worth of $407,207, that he acquired from his father's estate property of a total value of $1,135,959, that out of this separate estate he made a gift to the

community of a family residence of a value of $111,950.06, and that on December 31, 1962, the husband's "net worth" was $2,703,834.[1]

The trial court found that the value of the defendant's separate property had increased in value " * * * partly due to the continued exercise of defendant's [husband's] unusual experience, business judgment and management, and partly due to the inherent nature of the business or property itself." The court further found that it was unable " * * * to determine what portion of this increase is attributable to the defendant's individual work and what portion is attributable to capital appreciation, and therefore the Court finds that all of said increase is the community property of the parties hereto."

The court ordered the husband to pay permanent alimony to the wife of $1,500 per month, gave her the family residence, required the husband to pay the realty taxes on this home so long as it should be retained by her, awarded an appropriate amount for the support of the minor child of the parties, whose custody was awarded to the wife, granted the wife a divorce, and ordered the defendant to pay to her the sum of $60,000, payable in six annual installments of $10,000 each. All of the remaining community property of the parties was awarded to the husband.

The wife appeals from the judgment, contending that instead of an alimony award, the wife should have been given approximately one half of the community property. The husband cross appeals, contending that all of the accumulations of property were the separate estate of the husband, traceable to his estate at the time of marriage or the income from such estate.

The voluminous record in this action indicates that the husband's affairs were conducted largely through corporations and partnerships. During the nine years of the marriage, there were no less than forty such corporations and partnerships in which the husband had substantial interests. The theater circuit was operated by a "management team" headed by the husband, under whom served a general manager, a district manager, a "booker," various bookkeepers and secretaries. In this office, at the time of trial, there were nineteen sets of bookkeeping records being maintained as to Nace corporations or partnerships. These corporations and partnerships were interrelated both in functioning and financing. In the system of control used by the husband, one corporation or partnership might operate the "concessions" in a theater, the physical assets of which might be owned by a second corporation or partnership, with a third company actually operating the theater. There were numerous advances and loans between the various corporations and partnerships, and between the husband as an individual and the various corporations and partnerships. Properties were bought and sold between organizations at cost. Management fees were paid by corporations to a control corporation, these fees being determined in part by what the operated corporations were able to pay.

---

1. This divorce action was tried in April and May of 1965, and final judgment entered March 28, 1966. The valuation placed by the trial court on the husband's "net worth" as of December 31, 1962, has been accepted by the parties in briefs filed with this court as the pertinent total value to be considered. The evidence does not suggest any decrease in net values between this date of valuation and the date of the divorce decree. In this connection, there is in evidence a financial statement prepared by a certified public accountant employed by the husband indicating that his net worth at "fair market value" as of December 31, 1963, is $5,606,919.45. Likewise, though the valuations placed by the trial court upon the properties received from the father's estate (including the family residence) are valuations as of the date of the father's death, or one year later, the parties have accepted these valuations as being pertinent to the issues presented. The parties not having questioned these evaluations, we accept them for the purposes of this appeal. See Rule 5(d), Rules of the Supreme Court, 17 A.R.S.

In addition to the theater chain, the defendant controlled and managed two investment corporations. At various times during this marriage, he was involved as a partner or a joint venturer in cotton farming, oil drilling, subdividing of real property, and operating a trailer court. Additionally, as a sole proprietor, the husband had dealings in the purchase and sale of marketable securities and in the sale, trade and purchase of real property. Of the sixteen corporations most active at the time of the divorce trial, twelve had been formed prior to the marriage and four after. Those formed after, however, had a better record of growth in earnings. There was testimony that the twelve old corporations had incurred a total detriment in value of goodwill during the marriage of approximately half a million dollars and the corporations formed after had enjoyed a net increment in value of goodwill of approximately the same amount.

Some of the corporations paid to the defendant a "salary" which averaged, during the years of the marriage, $48,500 annually. These salaries were paid, according to the husband, from the corporations that could afford to pay a salary, and the salaries had no relation to the value of his services. Likewise, he testified that the total salaries received from all of the corporations had "no relation" to the value of his services. Two witnesses familar with the theater circuit operation testified that a competent manager could be hired for the Nace theater circuit for between $25,000 to $40,000 per year. However, neither of these witnesses demonstrated that they were aware of the extent and intricate nature of the operations conducted by the husband.

Some dividends were paid by the various corporations to the husband, but at the end of 1963, there were accumulated undistributed earnings in the corporations in excess of those which had been distributed. In the corporations formed prior to marriage, these undistributed earnings totaled $238,803, and in the corporations formed after

marriage they totaled $222,085. Several of the Nace corporations which were making good profits paid neither salaries nor dividends to the husband, but accumulated their earnings for the purpose of future expansion.

Substantially all of the financial transactions occurring were represented by checks on various banks and all of the transactions had been entered upon the books for the various corporations and partnerships. In addition, the husband kept two sets of personal books. The one he called his "regular" account and he contended that this represented all of his separate property transactions. The other set of books was set up shortly after his marriage in 1956, and was called the "special" account. It was the husband's contention that these books represented all community property transactions. If this were so, there would be no community property acquired during the marriage through the husband's full-time efforts in behalf of his business interests. There is no showing that the wife had any knowledge that records were being kept of "community" versus "separate" transactions.

Into the "special" account, the husband placed all of the "salaries" taken from the various corporations and in addition he transferred during the marriage into the "special" account from the "regular" account approximately $230,000. In addition to the personal living expenses of the husband, wife and child, during the marriage, the husband paid out of the "special" account alimony payments to his former wife of $800 per month. In addition, he made gifts, out of this special account, of mortgage payments for his former wife, income tax payments for his former wife, mortgage payments for his mother, support payments for his mother, and gifts and support payments for his two adult daughters, all of which, including the alimony, totaled something in excess of $125,000. In addition, the husband paid out of this account substantial sums of money for business and pleasure trips for himself, which

were not reimbursed to the "special" account. During the three calendar years of 1962–64 alone, there were approximately $34,000 so disbursed from the "special" account.

Life insurance policies carried by the husband as to which either his former wife, his mother, or his children by his former marriage were the beneficiaries were paid out of the "special" account, the premiums upon which totaled in excess of $3,000 per year. During the marriage, the husband received a commission on the sale of real estate, totaling $22,653, which was placed into the "regular" (allegedly separate) account. All drawings taken by him from partnerships were placed in the "regular" account. During the marriage, these totaled $101,076 through calendar year 1962.[2]

The husband received promissory notes in part payment of "salary" from two of the corporations during calendar years 1956–58 inclusive, and when these notes were paid subsequently the receipts were deposited into the "regular" account. The amount of these payments is not disclosed by the record.

During the marriage, the defendant borrowed from his corporations a total of $574,000 in forty-six different loans and loaned back to the corporations a total of $139,000 in fifteen other transactions. During the marriage, the amount taken by the husband in "salaries" from his various corporations generally declined, the average taken during 1956–59 inclusive being $52,298.75 and during the 1960–63 period, $44,453.91. There was no showing that the

corporations were earning any less money during these later years nor that the expenses of the family had reduced.

All investments of any kind made by the husband during the marriage were paid out of the "regular" account and all income from any of such investments was deposited in this account, regardless of how much time and effort the husband devoted to the particular enterprise. As to many of the business ventures engaged in by the husband, the capital investment was very small in comparison to the large profits made from such investment.[3] All loans and borrowings with the corporations and/or partnerships were handled through the "regular" account. All dividends received from the corporations were paid into this account.

There were seven corporations liquidated during the marriage, and the proceeds of the liquidations either deposited in the "regular" account or placed in other corporations through a process of merger. One partnership existing at the time of the marriage was incorporated during the marriage, several partnerships existing at the beginning of the marriage were dissolved. During the marriage, the husband formed six partnerships, three of which were still active at the time of the trial.

The "management team" on the payroll of the managing corporation looked after all of the affairs of the husband, regardless of whether a management fee was paid or not. The entire business operations of the husband were generally regarded by those employed as "just one operation."[4]

---

2. Many of the computations placed in evidence terminated in 1962 or 1963. Two reasons are suggested in the record for not bringing financial computations up to the date of trial: (1) the divorce action was filed on November 1, 1963, and (2) the voluminous nature of the records presented a man-hour problem as to updating the work prepared by the certified public accountant employed by the wife early in the litigation.

3. For instance, the testimony indicates that the husband's investment in the

partnership of Murphy-Nace was $17,423, and that during a three year period there was a total profit made by the husband in this partnership of $109,706. The record also indicates that from a $100 investment in Foreman-Nace, a partnership, the husband had earnings of $25,022 in 1963 and $11,054 in 1964.

4. Quote from testimony of the accountant in charge of the husband's record-keeping processes.

In disposing of the contentions made on appeal, we first turn to the husband's claim that the court was not justified in finding the increase in value of these properties to be community. The entire thrust of the husband's attack upon the judgment revolves around the "regular" and "special" accounts. The husband seeks to place himself within the holding of Porter v. Porter, 67 Ariz. 273, 195 P.2d 132 (1948). The trial court did not find the *Porter* decision to be apposite and we agree. The following language in *Porter* clearly distinguishes the facts of that case from those presented here:

"It may be pointed out here that there is no claim nor evidence that the success and resultant dividends of the N. Porter & Company corporation were due to any unusual talents or skill, management or other unusual attributes contributed to it by defendant. The evidence is undisputable that he was an employee, performing ordinary duties which could have been performed by other individuals not possessing any unusual qualifications." 67 Ariz. at 281, 195 P.2d at 137.

■ The facts of this case speak for themselves and are such that the trial court was justified in applying the law of Stauss v. Stauss, 82 Ariz. 268, 312 P.2d 148 (1957); Evans v. Evans, 79 Ariz. 284, 288 P.2d 775 (1955); Barr v. Petzhold, 77 Ariz. 399, 273 P.2d 161 (1954); Lawson v. Ridgeway, 72 Ariz. 253, 233 P.2d 459, 29 A.L.R.2d 518 (1951); Anderson v. Anderson, 65 Ariz. 184, 177 P.2d 227 (1947); Blaine v. Blaine, 63 Ariz. 100, 159 P.2d 786 (1945); and Estate of Torrey, 54 Ariz. 369, 95 P.2d 990 (1939).

■ Ordinarily, of course, it would not be proper to lump together different pieces of separate property and allocate a net increase in value of all such property to the community. Generally, each "piece" of separate property owned at the time of marriage retains its character as such during the marriage and this law applies even though such separate property may be sold and other property purchased with the proceeds. Flynn v. Allender, 75 Ariz. 322, 325, 256 P.2d 560 (1953); Guthrie v. Guthrie, 73 Ariz. 423, 426, 242 P.2d 549 (1952); Porter v. Porter, supra; Lincoln Fire Insurance Co. of New York v. Barnes, 53 Ariz. 264, 88 P.2d 533 (1939). But such tracing of individual pieces of property is not possible from this record. The reason for this failure of proof lies in the extreme complexity of the business affairs of the husband. The husband has taken the position that all of these properties constitute "a harmonious whole." [5] Accordingly, we hold that the trial court was justified in treating the properties of the husband as an entity, which would, under applicable law, retain its separate character, with the community having a lien thereon for the increase in value resulting from the efforts of the husband. Stauss v. Stauss, supra; Flynn v. Allender, supra; Lawson v. Ridgeway, supra; Rothman v. Rumbeck, 54 Ariz. 443, 96 P.2d 755 (1939).

■ We pass onto the wife's contention that the trial court abused its discretion in assigning to her only $60,000 of community property. The law of this jurisdiction on the division of community property is (1) that it should be normally divided between the husband and wife in a "substantially equivalent" manner, (2) that for "reason requiring a contrary action" the court may make an unequal division, and (3) that the trial court's broad discretionary power in determining what is "just and right" in the division of community property will not be disturbed on appeal unless such discretion has been "abused." Reed v. Reed, 82 Ariz. 168, 171, 309 P.2d 790, 792 (1957); and see Kennedy v. Kennedy, 93 Ariz. 252, 379 P.2d 966 (1963); Honig v. Honig, 77 Ariz. 247, 269 P.2d 737 (1954); Schwartz v. Durham, 52 Ariz. 256, 80 P.2d 453 (1938).

The "reason" advanced for the unequal division in this case is that the community

---

5. Quote from p. 26 of the husband's brief in this court.

property accumulated is due entirely to the business acumen and industry of the husband, working with separate estate which he possessed prior to marriage, and that therefore the court was justified in giving to him a "lion's share" of the community property because:

> "One cannot expect to reap in fields where he has never sown." Honig v. Honig, 77 Ariz. at 251, 269 P.2d at 740.

That it was the husband's efforts rather than those of the wife which resulted in the acquisition of community property, we believe is no "reason" for denying the wife substantial equivalence. It is the very essence of our community property system that a wife is entitled to share equally in the earning abilities of her husband, absent the most unusual of circumstances. LaTourette v. LaTourette, 15 Ariz. 200, 137 P. 426 (1914).

Our Supreme Court has said:

> " * * * the marriage relation in Arizona, and particularly in regard to the community estate, is more analogous to a partnership than any other status known to our laws." Ackel v. Ackel, 57 Ariz. 14, 22, 110 P.2d 238, 242, 133 A.L.R. 549 (1941).

In the light of this well-established law, we regard the real substance of the contention made by the husband to be that, even though under Arizona law these accumulations are community property, nevertheless, in making a division of this property, the court could take into consideration the probable contribution of the separate property to the accumulations.

In California and in New Mexico, the division made by the trial court would readily be approved, because in these states the law recognizes that a separate estate, when successfully managed, should receive a fair return with the remaining profit allocated to the community. This doctrine was first enunciated in the California decision of Pereira v. Pereira, 156 Cal. 1, 103 P. 488, 23 L.R.A.,N.S., 880, 134 Am.St.Rep. 107 (1909), and this law was adopted by our sister state to the east in Laughlin v. Laughlin, 49 N.M. 20, 155 P.2d 1010 (1944). Recent decisions reaffirming this doctrine in those states are: In re Neilson's Estate, 57 Cal.2d 733, 22 Cal.Rptr. 1, 371 P.2d 745 (1962), and Jones v. Jones, 67 N.M. 415, 356 P.2d 231 (1960).

However, we believe that Arizona has taken a different tack on this subject. Our difference from the California and New Mexico law was noted in Porter v. Porter, 67 Ariz. 273, 281, 195 P.2d 132, 137 (1948). In the absence of a clear showing that a fair salary for the husband's efforts has been set, Arizona decisions have followed an "all or none" rule, placing the earnings either all in the community, or all in the separate estate, depending upon the nature of the property, with every presumption being in favor of the community. Lawson v. Ridgeway, 72 Ariz. 253, 233 P.2d 459, 29 A.L.R.2d 518 (1951); and see Stauss v. Stauss, 82 Ariz. 268, 312 P.2d 148 (1957); Evans v. Evans, 79 Ariz. 284, 288 P.2d 775 (1955); Barr v. Petzhold, 77 Ariz. 399, 273 P.2d 161 (1954); Anderson v. Anderson, 65 Ariz. 184, 177 P.2d 227 (1947).

Arizona, in thus favoring the community, adheres more closely to the original Spanish law system, under which all of the increment in property during the marriage was regarded as community, even though such increment came from the earnings of separate property. 1 de Funiak, Principles of Community Property, § 71. The law of Texas, Louisiana and Idaho seems even more clearly to adhere to the original Spanish law concept. See Annot., 29 A.L.R.2d 530, at 534 (1953).

The decisions of our Supreme Court contain no suggestion that a valid "reason" for an unequal division of community property can be found in a consideration of the probable earnings of the separate estate. In every case called to our attention in which the Supreme Court approved a division as unequal as that presented here, there was clear evidence of a violation of the traditional marital duties

of either husband or wife, or of equitable need arising from custody of children, poor health or similar circumstances. For instance, in *Honig*, the court noted that the husband had "* * * shamefully disregarded his marital duties" (77 Ariz. at 251, 269 P.2d at 740) by deserting his family several times during the marriage and that the accumulations of the family were due entirely to the "* * * frugality and business sense * * *" (77 Ariz. at 251, 269 P.2d 737) of the wife. We do not consider the instant case, in which the wife has been granted a divorce from the husband for cruel treatment, and awarded custody of their child, to be an appropriate one for the application of the rule of *Honig*. To do so would be to deprive this wife of the "ownership" (LaTourette v. LaTourette, 15 Ariz. 200, at 207–208, 137 P. 426, at 428–429) of most of her property because she pursued her legal right to terminate a marital contract broken by her spouse.

■ The argument is also made by the husband that the division of community property is justified in that a generous alimony provision has been made. Our Supreme Court has held that a distribution of community property is justification for failing to order alimony. DeMarce v. DeMarce, 101 Ariz. 369, 419 P.2d 726 (1966); Franklin v. Franklin, 75 Ariz. 151, 253 P.2d 337 (1953). However, we do not believe the converse to be a part of our law.

■ We regard alimony as no substitute for property rights. As pointed out in the appellant's brief, the wife's right to receive $1,500 per month alimony is as "tenuous as a heartbeat." Alimony is extinguished upon the death of the husband, Spector v. Spector, 94 Ariz. 175, 382 P.2d 659 (1963), and may be reduced, or eliminated, in the light of changing circumstances, A.R.S. § 25–321, which changing circumstances might include a dissipation of the property providing the wherewithal for the substantial amounts of alimony ordered.

■ Being convinced that the division of the community property made by the trial court does substantial violence to the basic community property law of this state, we are constrained to make amends. On appeal, the appellate court has the power to make an appropriate division of the community property and should do so, if possible, in order to avoid further litigation. Kennedy v. Kennedy, 93 Ariz. 252, 379 P.2d 966 (1963); Spector v. Spector, supra. To the extent possible, we follow the judgment of the trial court.

■ It has been held that in making a division of community property, the divorce court may take into consideration gifts made from the community to the separate estate of either party. Schwartz v. Schwartz, 52 Ariz. 105, 79 P.2d 501, 116 A.L.R. 633 (1938). By analogy, we believe that the trial court could rightfully have taken into consideration the fact that the husband in this case made a gift to the community of a home of the value of $111,950. We believe the trial court also properly considered that much of the community state was heavily encumbered, thus recommending against ordering immediate liquidation of the community estate for distribution to the wife, a process which might jeopardize the financial structure of these businesses. See Spector v. Spector, supra. In his decree, the trial court limited the total annual payments of the husband to $30,000 ($18,000 in alimony, $10,000 in community property distribution and approximately $2,000 in real property taxes). We accept this as a finding by the trial court that annual payments in excess of this are not justified under the facts of this case.

■ We hold that it is "just and right," A.R.S. § 25–318, subsec. A, that the wife's share of the community property should be $500,000. Of this, she has received a value of $111,950 through the distribution of the home, leaving a balance of $388,050. This sum should bear interest at 6 per cent per annum from the date of the original divorce decree and should be payable at the rate of $2,500 per month, including interest. All amounts paid under the decree of the lower court by the husband should

be credited against his obligations under the modified divorce judgment herein ordered. All obligations of the husband under such modified judgment shall be a firm lien upon all property owned by the husband at the time of the divorce, including both his separate and community estate, and all property acquired through the sale or exchange thereof since the divorce decree and up to the time of the modified judgment to be entered.

The judgment to be entered shall provide for an option of acceleration in the time of payment of the remaining principal balance in the event that there be a delinquency in a monthly payment for a period of thirty days or more and shall provide for the recovery of reasonable attorney's fees and reasonable costs in the event it may be necessary to employ counsel for the enforcement of the rights of the wife in the community estate as herein established. The modified judgment shall provide that the court retains jurisdiction to release properties from the lien imposed by the judgment, in the event that this may be done without impairing in any way a firm security for the wife as to the balance owing to her as her share of the community property. See Spector v. Spector, 94 Ariz. at 186, 382 P.2d 659.

The obligation of the husband to pay alimony and realty taxes for the wife is set aside, the income from the community property set aside to the wife being ample for her support. DeMarce v. DeMarce, 101 Ariz. 369, 419 P.2d 726 (1966). The modified judgment shall provide for an award for reasonable attorney's fees and necessary expenses on this appeal and for such other expenses as may be reasonably incurred in the determination of an appropriate modified judgment.

The judgment of the trial court is affirmed except as to the division of the community property and as to alimony and in these regards, the judgment entered below is reversed with directions to the lower court to hold such hearings as may be necessary to effectuate this decision and to enter a modified judgment in accordance with the pronouncements herein contained.

HATHAWAY, C. J., and KRUCKER, J., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.