589 P.2d 1330

**In re the MARRIAGE OF Alfonso FONG aka Gim Hong Fong, Appellant and Cross-Appellee,**

and

**Ngan Woon Chow Fong, Appellee and Cross-Appellant.**

**No. 1 CA–CIV 3777.**

Court of Appeals of Arizona, Division 1, Department B.

Dec. 5, 1978.

Rehearing Denied Jan. 15, 1979.

Review Denied Jan. 30, 1979.

**300**

Murray Miller and Philip M. Haggerty, Phoenix, for appellant and cross-appellee.

Hughes & Hughes, P. C. by John C. Hughes, Phoenix, for appellee and cross-appellant.

## OPINION

JACOBSON, Presiding Judge.

The unusual facts in this case require us to determine, among other things, whether the trial court abused its discretion in awarding to the husband all the property acquired by the husband during the marriage of the parties.

This action was instituted by Ngan Woon Chow Fong (petitioner) for dissolution of the marriage allegedly existing between her and Alfonso Fong aka Gim Hong Fong (respondent). Because of the particular facts in this case, one of the major issues presented to the trial court was whether the petitioner was in fact the woman respondent married in China in 1923. This issue, which consumed 14 trial days, was submitted to an advisory jury which, in answer to an interrogatory, found that petitioner was respondent's wife.

Following the trial court's adoption of this finding, the questions of dissolution of the marriage, division of community property, spousal maintenance and attorneys' fees were submitted to the trial judge without a jury. Following protracted hearings, the trial court entered a judgment dissolving the marriage between the parties, awarding the petitioner the sum of $800 per month as spousal maintenance, awarding all community property to the respondent and awarding petitioner the sum of $25,000 as attorneys' fees (excluding fees on appeal) and the sum of $8,000 in costs.

Respondent has appealed from that portion of the decree finding the petitioner to be his wife and awarding her spousal maintenance, attorneys' fees and costs. Petitioner has cross-appealed from that portion of the decree awarding to the respondent all of the property accumulated during the marriage.

Although the hearings in this matter were protracted, the resulting factual picture is relatively clear. Respondent was born in China in approximately 1902. Apparently his father was an American citizen. On November 16, 1923, respondent entered into a marriage ceremony according to Chinese custom with Ngan Woon Chow Fong, then 17 years old, in Hoi Ping, Kwangtung, China. According to Chinese custom at that time, this marriage was arranged by the families of the parties through a professional matchmaker.

A short time thereafter, respondent moved to Cuba, where he lived and worked until 1933. In 1933, he returned to China

for a few months and then came to the United States. During this time, respondent's wife resided in his family's village in China and lived with his family, all in accordance with Chinese custom.

In 1934 or 1936, respondent returned to China and lived with his wife for a short period of time. As a result of this visitation, a son, John Fong, was born in 1936. In 1936, respondent returned to the United States and lived in Idaho, Oregon and California. In 1937 or 1938, respondent moved to Arizona and in 1939, began a grocery store business in south Phoenix, Arizona. He and his family have operated that store ever since.

In 1939, respondent attempted to bring his wife and son to the United States, but was frustrated by the war. In 1946, respondent was informed that his wife had died. (The trial court found as a fact that respondent's belief in the death of his wife was in good faith.)

In the following year, 1947, he brought his son, John Fong, to this country. In 1947, respondent married Lily Fong in Phoenix, Arizona. Lily Fong has lived with respondent ever since, bearing his seven children, six of whom survive.

Through thrift and diligence, respondent, after coming to Arizona, began to accumulate real property. At the time of his marriage to Lily Fong, respondent had acquired 14 separate pieces of real property. These properties were taken in respondent's name and the name of Ngan Woon Chow Fong, husband and wife, or in respondent's name alone as a married man.

On September 17, 1951, respondent filed a petition for letters of administration of the estate of Ngan Woon Chow Fong, deceased. As a result of this probate, five separate pieces of property, including a "store and equipment," were awarded to respondent as an undivided one-half owner and John Fong as an undivided one-half owner.

Over the years, respondent returned to China and Hong Kong on several occasions, in 1949, 1957 and finally in 1971. He testified that on his visit in 1957, he was introduced to the petitioner as his late wife's sister. It appears that petitioner was aware that respondent married Lily Fong in 1947 and recalls meeting respondent on his visit to Hong Kong in 1957.

In the meantime, John Fong was raised by respondent and Lily Fong and by 1972, John was in business for himself, owning a store in Tolleson, Arizona. In 1968, John went to Hong Kong where he married. He also left his wife in Hong Kong. Apparently, petitioner at that time was living in John's wife's home in Hong Kong, where she remained until 1972. In 1972, John Fong brought petitioner to the United States, declaring she was his mother and his father's wife. Prior to 1972, John had never informed his father of the fact that his mother was alive nor had petitioner contacted respondent since prior to 1946. At the time this action was filed, respondent had accumulated approximately $250,000 worth of real property, although his annual income had remained relatively modest. In 1971, respondent had adjusted gross income of $17,000; in 1972, $15,500; in 1973, $11,400; and in 1974, $20,200.

Petitioner, since coming to the United States, has lived with and worked for John Fong, earning $350 a month of which she returned $200 to John for "living expenses." Apparently these "living expenses" provide petitioner with all of her necessities.

For ease of presentation, we will first discuss whether or not the petitioner was the woman respondent married in 1923, then the division of community property, and then the issues of spousal maintenance and award of attorneys' fees.

■ As previously indicated, an advisory jury found as a fact that petitioner was respondent's wife. Respondent readily admits that there is evidence to support this determination, but complains of the refusal to give instructions on this issue. In particular, respondent contends that because he

in good faith entered into a second marriage, the jury should have been instructed that the law presumes that the first marriage ended in divorce or death.

We may deal with this issue summarily. No such instruction was ever requested. The reference quoted in the transcript by respondent on this issue appears to be an objection to the giving of an instruction that the petitioner had the burden of proving she was respondent's wife and respondent had the burden of proving his first wife was dead. Such an objection cannot stand as a request for instructions on presumptions. *See* Rule 51, Arizona Rules of Civil Procedure. We find no error here.

We now turn to petitioner's cross-appeal on the division of the community property. As previously noted, the trial court awarded all of the property acquired by the respondent during the term of the marriage to the respondent. This was accomplished by the trial court on a theory of estoppel. Petitioner attacks this award on two grounds: (1) that estoppel was simply not an issue raised or tried in this litigation; and (2) that such an award violates the vested rights of the petitioner under the community property laws of this state.

In arguing that estoppel was not an issue before the trial court, petitioner points out that this issue was not pled in accordance with Rule 8(d), Arizona Rules of Civil Procedure, was not an issue raised in the pre-trial conference and was not tried by consent during the presentation of evidence.

We agree that the issue of estoppel was simply not presented to the trial court. The specific wording of Rule 8(d), Arizona Rules of Civil Procedure, requires that "estoppel" be pled and Rule 12(i), Arizona Rules of Civil Procedure, provides that such a defense is deemed waived, unless pled. Where there was no amendment of the pleadings to conform to the evidence, the trial court could not base its ruling on this theory to justify its stripping petitioner of

community property rights. *See Keystone Copper Mining Co. v. Miller,* 63 Ariz. 544, 164 P.2d 603 (1945).

Respondent urges, however, that this court should affirm the trial court if its ruling was correct, even though it stated the wrong reason, citing *A.I.D. Insurance Services v. Riley,* 25 Ariz.App. 132, 541 P.2d 595 (1975). In this regard, respondent urges that given the unusual fact situation presented here and the petitioner's failure to contribute at all to the acquisition of the community property (either financially or morally), the court was justified in equitably distributing all of the community property to the respondent. This brings us to petitioner's argument that to do so deprives petitioner of her "vested" rights in that property.

Petitioner's "vested rights" argument is derived from the Arizona Supreme Court's language in *Hatch v. Hatch,* 113 Ariz. 130, 134, 547 P.2d 1044, 1048 (1976), which stated:

"We hold that the court's unequal property distribution was arbitrary, unreasonable and *an unconstitutional deprivation of the appellant's vested property interest in the community.*" (Emphasis added.)

Seizing upon this language, petitioner argues that to award her less than one-half the community property was an "unconstitutional deprivation" of her "vested property interests." Petitioner does not enunciate what specific constitutional rights are involved.

This language from *Hatch* must be viewed in context and with prior Arizona Supreme Court decisions in mind, for to carry this language to its logical conclusion would mandate that a division of community property could never be other than absolutely equal, a result, in our opinion, never contemplated by the community property laws of Arizona. *Hatch* involved the unique circumstance of the trial court granting a divorce, but waiting four years before making a division of the community

property. During the interim, as a result of the good management of the husband the community assets increased, and the wife apparently interfered with the relationship between the husband and his daughter. The trial court, based upon these considerations, gave the vast majority of the community property to the husband.

In holding that these reasons were not legally sound and therefore could not be utilized under the equitable powers of the court to divide community property, the Supreme Court cited with approval such cases as *Nace v. Nace,* 104 Ariz. 20, 448 P.2d 76 (1968) (the division of community property is within the sound discretion of the trial court); *Britz v. Britz,* 95 Ariz. 247, 389 P.2d 123 (1964) (division of community property should be *substantially* equal); and *Schwartz v. Durham,* 52 Ariz. 256, 80 P.2d 453 (1938) (in absence of sound reasons, division should be *substantially* equivalent).

Moreover, the *Hatch* court cited other Arizona cases where a disproportionate share of the community property was awarded one spouse as examples of sound reasons for unequal distribution. *See Armer v. Armer,* 105 Ariz. 284, 463 P.2d 818 (1970); *Honig v. Honig,* 77 Ariz. 247, 269 P.2d 737 (1954); *Patterson v. Patterson,* 63 Ariz. 499, 163 P.2d 850 (1945).

An absolutely equal division of community property would fly in the face of A.R.S. § 25–318(A) which provides in part:

"It [the court] shall also divide the community . . . property . . . *equitably,* though not necessarily in kind, without regard to marital misconduct." (Emphasis added.)

█ The bottom line holding in *Hatch,* which is sound, is that in the absence of valid reasons for dividing otherwise, divisions of community property should be substantially equal. However, we do not believe *Hatch* intended to hold or did hold that an unequal distribution must always fall because of constitutionally protected vested rights.

This brings us to a determination of whether valid reasons existed here for the unequal distribution of the property acquired by respondent in Arizona while petitioner was still his wife. In reaching this determination, it is helpful to consider the reasons underlying the Spanish community property system. As stated in W. de Funiak & M. Vaughn, Principles of Community Property, § 57 (2d ed. 1971):

"It was a basic principle of the Spanish community property system that for acquisitions and earnings of the spouses to constitute community, the spouses must have been cohabiting as husband and wife at the time of the acquisitions or earnings. This was because it was considered that it was the mutual loyalty, the mutual sharing of the burdens of marriage, the joint industry and labor of the spouses to further and advance the success and well-being of the marriage and of the family, which entitled them to share in the profits."

This did not mean, however, that the parties must live under the same roof or even in the same town, as long as the marriage actually continued to subsist:

"[The conclusion that property acquisitions are community] holds good and applies not only when the husband and wife cohabit in the same town and house, but even if they are in different places, provided the marriage subsists, and their mutual consent and union of wills, and no divorce has intervened, e. g., if the husband is employed, and the wife, because the climate is hurtful to her health, or for some other just cause remains in her country, or if she has therein some business, and the husband another business elsewhere; in these and other similar cases, the marriage, and the partnership and the union of wills subsist, although not that of their persons, so that all that one or the other or both gain, should be shared and divided in half; notwithstanding that some say that for this there is necessary the simultaneous cohabitation;

but this opinion is rejected as destitute of a solid foundation." W. de Funiak & M. Vaughn, Principles of Community Property § 57 n. 25, quoting Febrero, Librería de Escribanos, Cinco Juicios I, Book I, Cap. IV, § 1, No. 2.

■ While the Spanish community property law would declare that property acquired after the "union of wills" has ceased would not be considered community property, we do not need to go so far.[1] Suffice it to say here that if we consider all the property acquired by the respondent in Arizona during the duration of his marriage to petitioner to be community, then whether the marriage in fact "continues to subsist" can properly be considered as a legally valid reason for "equitably" distributing the community property.

Applying this rationale to this case, the facts indicate a clear point at which the mutual will to union ceased between petitioner and respondent—at the time respondent entertained a good faith belief that petitioner was dead and entered into a second marriage ceremony with Lily. We do not mean to intimate that merely being a party to a second marriage ceremony can have the effect of cutting off community property interests. However, here, the trial court found, and the evidence supports that finding, that respondent entertained a good faith belief in his wife's death. At least as to respondent, the intangible support respondent derived from his marriage to petitioner ceased at that point.

The "will to union" on the part of petitioner after this date is less clear. However, there was testimony that petitioner allowed her son to come to the United States without communicating the fact of her existence; that she was aware of respondent's marriage to Lily; that she never communicated the fact of her existence to respondent after acquiring this knowledge; and that on respondent's visit to Hong Kong, she passed herself off as the sister of respondent's deceased wife. Petitioner's counsel explains petitioner's conduct in these matters as being consistent with the alleged traditional Chinese custom of a husband taking a second, younger wife, and his dominance in the marriage relationship. This may very well be true, but the fact remains that this conduct could be considered inconsistent with a conjugal partnership in earnings and gains, a partnership also unknown to traditional Chinese custom.

It is this conduct on the part of petitioner, we are sure, which led the trial court to hold her "estopped" from sharing in the community property. While we have held that estoppel is not properly before the trial court, these facts could properly be considered in determining whether there existed on either party's part a mutual loyalty and a mutual sharing of the burdens of marriage. The facts indicate, and the trial court could have found (and probably did find under its theory of estoppel) that these factors ceased to exist upon respondent's marriage to Lily and make an equitable division of community property based thereon. We can therefore affirm that portion of the division of community property awarding to respondent all community property acquired after the marriage in 1947 to Lily.

■ The property acquired prior to that date poses a different problem. The evidence shows that respondent, prior to the news of petitioner's death and his subsequent marriage to Lily, considered himself a married man. Title to real property acquired during this period was either taken in his and petitioner's name, or in his name

---

1. A.R.S. § 25 -211 provides:

"All property acquired by either husband or wife during the marriage, except that which is acquired by gift, devise or descent, is the community property of the husband and wife."

Whether this statute is merely a codification of the Spanish community property law and thus subject to that law's interpretation, or a statutory pronouncement, not subject to exceptions, we need not decide.

as a married man. Respondent during this period made attempts to bring the petitioner to the United States. In short, the evidence would support a finding that the "will to union" existed in both respondent and petitioner during this period. This factor being present, and no other valid reasons being suggested upon which the trial court could exercise its equitable powers of distribution, it follows, under the rationale of *Hatch v. Hatch, supra,* that the division of this community property must be substantially equal.

■ It appears that some of the pre-1947 property has been sold, given as gifts, retained, and a portion consists of the market established by respondent in 1939, and which continues to operate. Normally, the community is entitled to the profits and gains attributable to community assets. *See, e. g., Blaine v. Blaine,* 63 Ariz. 100, 159 P.2d 786 (1945). However, under the unique factual situation presented here, and because the issue of whether this principle should apply where disposition of certain parcels has been made and a portion of the assets consists of a going business has not been briefed or argued before this court, we leave to the trial court the determination of whether the pre-1947 community property should be valued at 1947 values or values fixed as of the time of dissolution.

The respondent next contends that the award by the trial court of $800 per month as spousal maintenance was an abuse of discretion. This argument is two pronged: (1) that there was no showing that petitioner needed $800 per month to live; and (2) that the annual payment of spousal maintenance was approximately 50 percent of respondent's annual income and therefore was excessive.

Respondent's first argument is premised on the rather marginal life-style to which petitioner had been subjected, both in China and Hong Kong, and in the United States and the fact that John Fong was paying her $350 per month out of which he was providing all of her necessities.

■ We first note that petitioner, at the time of trial, was approximately 72 years old, could neither read nor write English and was virtually illiterate in Chinese. Further, the record is silent as to any marketable skills she may possess. While it is true, in the normal marriage situation, that the trial court may properly consider standards of living that the marriage provided in awarding alimony, *Porreca v. Porreca,* 8 Ariz.App. 394, 446 P.2d 500 (1968), this is not the normal marriage situation. Petitioner, according to the evidence, has in essence lived her entire life on the largess of others. The trial court found that the respondent entertained a good faith belief that petitioner was dead, hence, he cannot be completely faulted for petitioner's plight. On the other hand, we do not believe that petitioner should be punished because circumstances placed her in a situation of marginal existence. Under the unique facts here, we cannot say that the trial court abused its discretion in disregarding petitioner's prior standard of living in assessing a spousal maintenance award.

■ Respondent next contends that there is no showing that petitioner in fact needs $800 per month, as she is working for her son, who is providing all of her necessities. Putting aside the payment of wages by the son for the moment, we know of no legal obligation falling on an adult child to care for an elderly parent. While such a moral obligation may exist (and an even stronger moral obligation may exist in the Chinese culture), the fulfilling of that moral obligation cannot relieve the respondent of his legal obligation of support.[2] The trial court did not abuse its discretion in failing to give the weight respondent urges to the

2. There is no doubt that petitioner qualifies under A.R.S. § 25–319 as a recipient for some spousal maintenance.

son providing necessities to his mother. As to the stipend being paid to petitioner by the son, considering her age and linguistic limitations, the trial court could have considered this payment as an allowance rather than a true measure of petitioner's earning capacity, and as such, disregarded it in setting spousal maintenance.

 However, we have by this opinion awarded to the petitioner some portion of the community property estate, the exact amount of which awaits further fact finding. A.R.S. § 25–319(B)(1) provides that in setting spousal maintenance, the court should consider "[t]he financial resources of the party seeking maintenance, including marital property apportioned to such party . . . ." Since this factor was not present at the time spousal maintenance was set by the court, but will be present on remand, we deem it appropriate to vacate the award of spousal maintenance entered in this case in order to allow the trial court to reconsider this issue in view of A.R.S. § 25–319(B)(1), and the views expressed in this opinion.

Finally, respondent argues that the trial court erroneously awarded petitioner $32,500 as attorneys' fees (including $7,500 for attorneys' fees on appeal), together with the sum of $8,000 in costs. Respondent does not contend that the amount of work performed by petitioner's attorneys would not justify the fee assessed, that is, that the fees themselves are unreasonable. Rather, respondent urges that the fees become unreasonable when considering his "financial resources" under A.R.S. § 25–324, that is, his ability to pay.

The awarding of attorneys' fees, like spousal maintenance, is within the sound discretion of the trial court both as to whether they should be awarded at all and as to the amount. *Burkhardt v. Burkhardt,* 109 Ariz. 419, 510 P.2d 735 (1973). Since neither the right of petitioner to be awarded fees nor the justification for the fees that were awarded is challenged, and con-

sidering the separate property held by the respondent, we cannot say that the trial court abused its discretion either as to attorneys' fees or as to costs in the award made.

As previously indicated, the judgment of the court finding the petitioner to be respondent's wife is affirmed; the portion of the decree awarding respondent all of the community property is affirmed in part and reversed in part and remanded to the trial court with directions to proceed in accordance with this opinion; that portion of the judgment awarding spousal maintenance is vacated, for reconsideration by the trial court; the judgment as to attorneys' fees and costs is affirmed.

SCHROEDER and OGG, JJ., concur.